**7–ELEVEN, INC., Plaintiff,**

v.

**KAPOOR BROTHERS INC., Pursharth Kapoor, Defendants.**

**Case No. 6:13–cv–953–Orl–36GJK.**

United States District Court, M.D. Florida, Orlando Division.

Sept. 13, 2013.

Christian C. Burden, John Matthew Guard, Lindsay Saxe, Quarles & Brady, LLP, Tampa, FL, for Plaintiff.

Edward Michael Livingston, The Livingston Firm, PA, Naples, FL, James R. Lavigne, Juan Carlos Real, South Milhausen, PA, Orlando, FL, for Defendants.

## *PRELIMINARY INJUNCTION*

CHARLENE EDWARDS HONEYWELL, District Judge.

This cause is before the Court on Plaintiff 7–Eleven, Inc.'s ("Plaintiff" or "7–Eleven") Motion for Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65, filed on June 27, 2013 ("Motion"), Doc. 10, and supported by two affidavits, Docs. 10–1 and 10–2. Plaintiff subsequently filed two supplemental affidavits in support of the Motion, one on July 12, 2013, Doc. 19, and the other on July 19, 2013, Doc. 22. Defendants Kapoor Brothers, Inc. ("Kapoor Brothers") and Pursharth Kapoor ("Kapoor") filed a joint response in opposition to the Motion on July 17, 2013, Doc. 21, which was supported by an affidavit from Defendant Kapoor, Doc. 21–3. Defendants filed a supplemental affidavit by Defendant Kapoor on July 19, 2013, presumably in response to Plaintiff's supplemental affidavits, Doc. 23. The parties' filings of supplemental affidavits without leave of court were improper. The Court has nevertheless considered them as part of the record.

On July 24 and 31, 2013, the Court held an evidentiary hearing on the Motion. *See* Docs. 30, 32. Upon due consideration of the evidence, stipulation of facts and the arguments of counsel, the Motion will be granted.

## I. FINDINGS [1]

### A. The Parties

Plaintiff 7–Eleven is a Texas-based franchisor of convenience store businesses. Doc. 1 ¶ 5, ("Compl."); Doc. 29, ¶ 1, Stipulation of Facts ("Stip."). Defendant Kapoor is an individual residing in Brevard County, Florida and is also the owner and sole officer of Defendant Kapoor Brothers, a Florida corporation whose principal place of business is in Brevard County. Compl. ¶¶ 6–7; Stip. ¶ 6.

In December 2011, 7–Eleven entered into a franchise agreement with Mr. Kapoor for the operation of 7–Eleven convenience store No. 22244A ("Store '44"), located at 1105 Courtenay Parkway, Merritt

---

1. These findings are based on the pleadings, exhibits, affidavits stipulation of facts and memoranda filed with the Court, as well as the testimony presented during the motion hearing.

Island, Florida 32593. Stip. ¶ 4; Jt. Ex. 1. Mr. Kapoor began operating Store '44 in January 2012. Compl. ¶ 46. He intended that Store '44 would be one of multiple stores he would own. After several months of successful operations, 7–Eleven approved a second franchise for Mr. Kapoor. In June 2012, 7–Eleven entered into a franchise agreement with Mr. Kapoor's corporation, Kapoor Brothers, for the operation of 7–Eleven convenience store No. 25737A ("Store '37"), located at 400 W. Merritt Island Causeway, Merritt Island, Florida 32592. Stip. ¶ 5; Jt. Ex. 2. As its owner, Mr. Kapoor guaranteed Kapoor Brothers's obligations to 7–Eleven and is essentially the franchisee for both stores. Stip. ¶ 6; Jt. Ex. 3. Mr. Kapoor first opened this store for business in July of 2012. Compl. ¶ 47.

## B. The Franchise Relationship and 7–Eleven's Retail Information System

7–Eleven owns a number of federally-registered trademarks and service marks associated with its business, including 7–Eleven®, Slurpee®, and Big Gulp®. Stip. ¶ 2. It licenses the use of these trademarks, as well as its business "system"—the methods and procedures it has developed to operate its businesses—to its franchisees through the written franchise agreements.[2] Id. ¶¶ 1, 3; Jt. Exs. 1, 2 at ¶ 7. These marks are widely known and used by thousands of 7–Eleven stores. 7–Eleven also leases store property and equipment to franchisees through the franchise agreements. Jt. Exs. 1, 2 at ¶ 8. In exchange for this, 7–Eleven receives a defined percentage of "gross profit" (sales less costs of goods sold), called the "7–Eleven Charge." Id. ¶ 10.

As part of the franchise relationship, 7–Eleven provides instruction, ongoing advice, and a number of operational services, including training, merchandising consultation, periodic financial summaries, and vendor ordering and management. Jt. Exs. 1, 2 at ¶¶ 1(a)(5), 4, 12(e) & 15. 7–Eleven also provides computer software to its franchisees. The "Retail Information System" used by 7–Eleven franchisees consists of integrated software modules handling register transactions and back-office functions such as inventory tracking and ordering. Jt. Exs. 1, 2 at ¶ 12(f).

The register portion of the Retail Information System is also called a "POS" or "Point of Sale" system. The operator of the POS system controls its functioning from a touch screen interface. Pl.'s Ex. 3 at 1. In a typical sale transaction, the POS system is used to scan and total merchandise. The operator will then collect payment from the customer and the register drawer will open to deposit the payment and make change. The POS system also adjusts (reduces) the store's book inventory by the merchandise sold. This is part of the inventory tracking function of the Retail Information System, which calculates book inventory for the store based on reported inventory acquisitions (merchandise coming into the store) and sales from the POS system (merchandise leaving the store).

## C. The Requirement to Accurately Report Sales and Inventory Transactions

The proper reporting of sales and inventory transactions in the Retail Information System is required by the franchise agreement. Jt. Exs. 1, 2 at ¶¶ 12(c)(1), 12(c)(3), 12(f) & 19(f). 7–Eleven's franchisees ac-

---

**2.** This Order does not distinguish between the franchise agreements. They are largely identical in content, and the discussed activities of Mr. Kapoor and Kapoor Brothers are essentially the same.

knowledge, pursuant to their franchise agreement, that 7–Eleven relies on the accuracy of information the franchisee provides them:

> You acknowledge that we are relying on the accuracy of all information you and your employees provide, including all payroll information. You agree that all information that you and your employees provide will be truthful, accurate, complete and in compliance with all applicable laws and with all policies or requirements we implement from time to time . . . .

*Id.* ¶ 12(c)(3). 7–Eleven maintains that a franchisee's adherence to this provision is essential to the intended functioning of the franchise relationship. According to 7–Eleven, the validity and meaningfulness of the advice it provides, the financial summaries it prepares and the vendor services it performs are all dependent on the accuracy of the information provided by the franchisee.

One way that 7–Eleven can detect if the reporting of sales and inventory transactions for a franchised store is improper is through their Asset Protection Department. For example, the POS system has "no sale" and "safe drop" functions that open the register drawer. *See* Pl.'s Ex. 3 at 1. These keys can be used, improperly, to open the register drawer and collect payment for sale transactions that the POS system will not record as such. As explained in more detail below, the Asset Protection Department can observe when a POS system operator has used these register-opening keys, which often occurs in conjunction with the use of other otherwise legitimate register functions, that make it appear to the casual observer (the customer) that a normal sale has occurred, when in fact the sale transaction was not recorded by the POS system because the "no sale" or "safe drop" keys were used.

For example, the "Cancel Age Verification" register function can be used in conjunction with these register-opening keys to misrepresent a sales transaction. If a customer attempts to buy an age-restricted item, such as tobacco or alcohol, the POS system will display a dialog box with a yellow background to the register operator. Pl.'s Ex. 3 at 2. The register operator must then confirm that the customer's age has been verified, in which case the sales transaction of the age-restricted product will proceed, or the operator can exit the age verification dialog and thereby cancel the sale of the age-restricted item. *See id.* This function can be used to mask the appearance of a normal sale by scanning the age-restricted merchandise and then exiting the age verification dialog followed by the "no sale" or "safe drop" key, which will open the register drawer, allowing payment to be collected and change made. In this fashion, although the customer and POS system operator have completed a sale and merchandise leaves the store, no actual sale has been recorded by the POS system. Such underreporting of actual sales, in addition to damaging the functioning of the franchise relationship, also deprives 7–Eleven of its full share of the franchised store's gross profit.

### D. Investigation of Store '44 and Store '37

7–Eleven's Asset Protection Department monitors excessive use of certain "high-risk" register transactions, including the Cancel Age Verification function and the "no sale" key as they are indicative of employee theft. Where alerted by excessive use, 7–Eleven will review the available records, including video, to confirm whether improper activity is occurring and, if confirmed, the information and identification of the involved employee is provided to the franchisee. According to 7–Eleven,

it is rare that the person committing the theft turns out to be the franchisee.

In December of 2012, 7–Eleven was alerted to excessive use of the Cancel Age Verification and other transaction voiding functions at the Defendants' stores and undertook its normal review. Upon determining that Mr. Kapoor was involved, 7–Eleven commenced a broader investigation of the stores. 7–Eleven's Asset Protection Department reviewed sales and inventory data from the Retail Information System and commissioned an out-of-cycle audit to review whether there were inventory category variances.[3] It also retrieved the security camera digital video recorders ("DVR") and expended about 200 hours reviewing store video of several weeks of questioned transactions.

7–Eleven's investigation found that Mr. Kapoor and his brother, Sidharth Kapoor, who was Mr. Kapoor's appointed manager at Store '44, were improperly using the transaction voiding register keys, especially the Cancel Age Verification function. In the DVR video it reviewed, 7–Eleven found more than 100 instances of Mr. Kapoor and his brother improperly using the POS system to cancel sales, primarily of cigarettes, which sales were in fact consummated. Pl.'s Exs. 7, 8. Plaintiff's Ex-

hibit 4 consists of a USB flash drive containing a sample of the videos showing Mr. Kapoor and his brother improperly using the Cancel Age Verification function. Pl.'s Ex. 4 (video files in folders labeled with the prefix "D", "C" and "B"). During the evidentiary hearing, Mr. Kapoor admitted that this improper cancel age verification activity had been undertaken as many as some 4,000 times in the prior eighteen months.

7–Eleven's analyses of the out-of-cycle audits for the stores were consistent with the observed improper voiding activities and indicated that Mr. Kapoor had acquired inventory without reporting it to 7–Eleven. Pl.'s Exs. 5, 6. For example, the audit for Store '44 shows a substantial negative variance ($5,081.70) between the book inventory of cigarettes per the Retail Information System and the physical inventory count, which is consistent with the inventory shortage to be expected when cigarettes are sold without a corresponding sale in the POS System. Pl.'s Ex. 5. Other inventory categories from the audit analyses show substantial positive variance (overage), which is indicative of acquiring inventory without reporting that acquisition to 7–Eleven in order to conceal unreported sales which would result in category shortages.[4]

---

3. The physical inventory of 7–Eleven franchised stores is normally audited quarterly. *See* Jt. Exs. 1, 2 at ¶ 14. 7–Eleven reviews an audit to assess actual versus retail book inventory on a whole store basis. In this manner, if a franchisee sells, without reporting, one category of inventory, such as $5.00 in cigarettes, and then purchases $5.00 of non-carbonated beverages (at retail value) in another category, the category shortages and overages will balance on a whole store basis and conceal the unreported cigarette sale.

4. To illustrate what 7–Eleven perceived as inventory manipulation, 7–Eleven offered photographs of Mr. Kapoor delivering several boxes to Store '44 labeled "M*Volt," which is a brand of cellular telephone accessory. Pl.'s

Exs. 9, 10. Mr. Kapoor delivered these boxes on February 6, 2013, and he knew an audit was occurring the next day. Store video from only a few hours after the audit's completion showed Mr. Kapoor's brother leaving the store with the same M*Volt Boxes. Pl.'s Ex. 4. Mr. Kapoor testified that these items were cell phone chargers and had a retail value of approximately $9,000, although he has been unable to procure any receipt for them and he does not remember reporting the inventory acquisition to 7–Eleven as required. At the time of the audit, 7–Eleven had no record of this inventory and consequently the items in these boxes were recorded as an inventory overage.

By the end of April 2013, 7–Eleven's Asset Protection Department had concluded its investigation and made a report to 7–Eleven's management. Included in the report was an observation that the labor costs at Mr. Kapoor's stores were unusually low. The Asset Protection Department was then asked to make a further investigation and review the stores' labor circumstances. Ultimately, this further investigation concluded that Mr. Kapoor was employing persons who were ineligible to work in the United States and that these employees had used false social security numbers in their employment paperwork. The wages of these ineligible employees were substantially underreported. 7–Eleven believes this underreporting was done intentionally in an effort to avoid calling attention to the fact that the employees were ineligible to work. 7–Eleven was unwittingly implicated in this illegal employment scheme in that 7–Eleven processed the payroll[5] for these employees and prepared W–2s using the false social security numbers associated with these employees that Mr. Kapoor provided to 7–Eleven. *See* Pl.'s Ex. 11.

### E. Termination of the Franchise Agreements for Store '44 and Store '37

Following the conclusion of its investigation, 7–Eleven contacted Mr. Kapoor and requested that he meet with senior 7–Eleven manager Garrick Carter on June 20, 2013. Instead, when Mr. Kapoor arrived, 7–Eleven had him meet with Timothy Hall, 7–Eleven's Asset Protection Manager for the North Florida Zone, who presented Mr. Kapoor with the results of the company's investigations of Store '44 and Store '37. During the June 20, 2013

meeting, Mr. Kapoor acknowledged that he had made repeated, improper use of the cancel age verification function and other transaction voiding keys, had failed to report inventory purchases to 7–Eleven, and was employing persons at the stores that were ineligible to work in the United States.

At the conclusion of the June 20, 2013 meeting, 7–Eleven handed Mr. Kapoor two letters entitled "Non–Curable Notice of Material Breach and Termination"—one for Store '44 and one for Store '37. Jt. Exs. 4, 5; Stip. ¶¶ 7, 8. These termination notices identified the provisions of the franchise agreements that Mr. Kapoor had violated and stated that:

> The practices enumerated above are a pattern of abuses that are willful and fraudulent and violate the fundamental purposes of the Franchise Agreement and go to the very core of the franchise relationship between you and 7–Eleven. As a result, **NOTICE IS HEREBY GIVEN TO YOU OF *IMMEDIATE* TERMINATION OF THE FRANCHISE AGREEMENT. GIVEN THE NATURE OF YOUR BREACH, THIS NOTICE OF MATERIAL BREACH AND TERMINATION MAY *NOT* BE CURED BY YOU.**

*See id.* at 3 (emphasis in original). 7–Eleven also notified Mr. Kapoor that it was discontinuing its financing for the stores and asked that Mr. Kapoor surrender the stores. Jt. Ex. 4–5 at 4, 6; Stip. ¶¶ 7–9. After Mr. Kapoor refused to do so, 7–Eleven removed certain high-risk items from the stores like lottery and food stamp machines, and money order equipment and pre-paid cards. Stip. ¶ 11. 7–Eleven also shut down the gas pumps and acted to cease further inventory deliveries

---

5. 7–Eleven processes payroll as part of its services provided to franchisees. As the employer, Mr. Kapoor controls all aspects of employment, including hiring, firing and scheduling and is responsible for paying wages. *See* Jt. Exs. 1, 2 at ¶ 2(c).

to the stores. *Id.* Additionally, 7–Eleven posted notices at both stores that it would no longer fund the stores' employee payroll after June 20, and demanded repayment of the open account balance for their stores. Stip. ¶¶ 7–10; Jt. Exs. 4–6, 7.

The next day, June 21, 2013, 7–Eleven sent a letter to Mr. Kapoor regarding his failure to cease operations of the stores pursuant to the termination of their franchise agreements. Stip. ¶ 12, Jt. Ex. 8. Mr. Kapoor responded, through his attorney, to the notices of termination and to 7–Eleven's June 21 letter by sending 7–Eleven a letter on June 24, 2013. Stip. ¶ 13, Jt. Ex. 9. Mr. Kapoor's position was that he had a right to cure under the franchise agreements and he had done so by ceasing the improper voiding activity and firing the illegally-employed workers.[6] Jt. Ex. 9 at 2–3.

Since June 20, 2013, Mr. Kapoor has continued to operate the stores and use 7–Eleven's marks without 7–Eleven's authorization or support services, 7–Eleven contends. Numerous customer complaints have been made to 7–Eleven concerning the operation of the stores. *See* Pl.'s Ex. 17.

## II.   PROCEDURAL HISTORY

On June 20, 2013, Plaintiff filed the present action against Defendants, alleging eleven counts in its Complaint: 1) Infringement; 2) Unfair Competition; 3) Breach of Post–Termination Obligations; 4) Breach of the Franchise Agreement (with respect to Defendant Kapoor); 5) Breach of the Franchise Agreement (with respect to Defendant Kapoor Brothers); 6) Breach of the Guaranty; 7) Common Law Fraud; 8) Declaratory Judgment; 9) Eviction; 10) Replevin; and 11) Collection of

Promissory Note. *See* Compl. Thereafter, Plaintiff filed the instant Motion, seeking injunctive relief with respect to: 1) Counts I and II of the Complaint, namely, 7–Eleven's trademark infringement and unfair competition claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.;* and 2) Count III of the Complaint regarding post-termination obligations and restrictive covenants against competition in the franchise agreements. Compl.; Mot. at 1.

## III.   LEGAL STANDARD AND APPLICABLE LAW

"A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,* 320 F.3d 1205, 1210 (11th Cir.2003) (citations omitted). "The purpose of … a preliminary injunction is 'merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *United States v. Lambert,* 695 F.2d 536, 539–40 (11th Cir. 1983) (quoting *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998) (citing *All Care Nursing Service, Inc. v. Bethesda Memorial Hosp., Inc.,* 887

---

**6.** This letter denied that Mr. Kapoor had acquired off-the-books inventory to conceal the sales. *See* Jt. Ex. 9 at 2.

F.2d 1535, 1537 (11th Cir.1989)) (internal citations omitted).

■ While federal procedural law governs the Court's application of the injunction standards, the interpretation and construction of the franchise agreements is governed by state substantive law. *See FHR TB, LLC v. TB Isle Resort, LP,* 865 F.Supp.2d 1172, 1191 (S.D.Fla.2011) (citing *Ferrero v. Associated Materials, Inc.,* 923 F.2d 1441, 1448 (11th Cir.1991)). In Florida, the parties' selection of a particular state's laws to govern their relationship will be recognized unless the chosen law somehow contravenes public policy. *Coral Gables Imported Motorcars, Inc. v. Fiat Motors of North America, Inc.,* 673 F.2d 1234, 1238 (11th Cir.1982). The franchise agreements provide that they will be governed and interpreted in accordance with the law of the state where the stores are located—in this instance, Florida. *See* Jt. Exs. 1, 2 at ¶ 30(a).

## IV. ANALYSIS

■ 7–Eleven's claims are predicated on termination of the franchise agreements. Therefore, the Court will first address the propriety of the termination and then turn to whether 7–Eleven has established the prerequisites to preliminary injunctive relief.[7]

### A. Termination of the Franchise Agreements for Store '44 and Store '37

■ The Lanham Act requires that a trademark owner demonstrate that "unauthorized trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee." *McDonald's,* 147 F.3d at 1308, *see* 15 U.S.C.

§ 1114(1)(a). Here, to prevail requires "some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the unauthorized use of trademarks by the former franchisee." *Id.*

For most violations of the subject 7–Eleven franchise agreements, notice and an opportunity to cure must be given to the franchisee before the agreement can be terminated based on such violation(s). Jt. Exs. 1, 2 at ¶ 26(a) ("[7–Eleven] may terminate this Agreement (subject to your right to cure where stated below) for the occurrence of any one (1) or more of the following events (each of which you acknowledge is a Material Breach and constitutes good cause for termination ...")). In this case, however, 7–Eleven's notices of termination were effective immediately. Jt. Exs. 4, 5. Defendants claim that they were entitled to notice and an opportunity to cure their breaches in accordance with the provisions in the agreements and that, therefore, 7–Eleven's immediate termination of the agreements was invalid. Doc. 21 at 14. Thus, 7–Eleven must demonstrate that notice and a cure opportunity were not required.

■ 7–Eleven states that notice and an opportunity to cure were not needed because Defendants' conduct was willful and fraudulent, violating the essence of the franchise agreements and destroying the mutual trust necessary to the parties' continued business relationship. The Court agrees.

7–Eleven relies on a number of cases from other jurisdictions that have adopted the common law principle that notice and opportunity to cure provisions in a con-

---

7. The *ad damnum* of Defendants' Response in Opposition to 7–Eleven's Motion for Preliminary Injunction requests injunctive relief against 7–Eleven. Doc. 21. This request is not properly before the Court and is, therefore, not addressed in this Order. *See* Fed. R.Civ.P. 7(b) ("A request for a court order must be made by motion.").

tract are unenforceable for breaches that go "to the essence of the contract, which [are] so exceedingly grave as to irreparably damage the trust between the contracting parties." *See 7–Eleven, Inc. v. Upadhyaya,* 926 F.Supp.2d 614, 626 (E.D.Pa.2013) (citing *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 599 Pa. 546, 567, 962 A.2d 639 (Pa.2009)). A common theme in many of these immediate termination cases is that giving notice before termination for fraud or other dishonesty is a "useless gesture" because that conduct by its nature cannot reasonably be cured. *Id.* at 629–30 (finding 7–Eleven's termination of a franchise agreement without notice and opportunity to cure to be proper because the "[d]efendants' fraudulent actions served to destroy all trust between themselves and 7–Eleven and the Court finds that requiring ... notice before termination under such circumstances would be a useless gesture, as such a breach may not reasonably be cured.") (internal quotations and citations omitted). "Such a breach is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate." *LJL Transp.,* 599 Pa. at 567, 962 A.2d 639; *see also Dunkin' Donuts Inc. v. Gav–Stra Donuts, Inc.,* 139 F.Supp.2d 147, 155 (D.Mass.2001) (holding that franchisee was not entitled to cure breach of franchise agreement where the breach involved intentional falsification of financial data by overstating expenses and understating profits); *Southland Corp. v. Froelich,* 41 F.Supp.2d 227, 247 (E.D.N.Y.1999) (7–Eleven franchisees' scheme of under-reporting sales, thereby depriving the franchisor of its contractual share of the profits, was non-curable and went to "essence of the contract"); *Southland Corp. v. Mir,* 748 F.Supp. 969, 983–84 (E.D.N.Y.1990) (the 7–Eleven franchisees had no right to cure breach of agreement where their "knowing and willful" "money order scam" to misrepresent and conceal store revenues deprived 7–Eleven, as the franchisor, of its contractual share of the convenience store's profits, as this went to the "root of the matter or essence of the contract"); *see also In re Best Film and Video,* 46 B.R. 861, 871–75 (Bankr.E.D.N.Y.1985) (concluding that a franchisee's unauthorized editing and showing of a film was so egregious as to constitute a vital breach of the agreement justifying immediate termination).

The only Florida case 7–Eleven relies upon to support this principle is not directly on point because the contractual language at issue was nonmandatory. *See Leghorn v. Wieland,* 289 So.2d 745 (Fla. Dist.Ct.App.1974). The *Leghorn* case involved the termination of an allegedly embezzling employee, and the employment contract did not require notice and an opportunity to cure before termination. *Id.* at 747. Instead, the court interpreted the parties' use of the word "may" in the agreement as indicative of their intent that the giving of notice should be optional. *Id.* Specifically, the court concluded that by using the word "may," "the parties did not intend to make the giving of notice the 'legal duty' of either party. If either party considered the default of insufficient consequence, it had the option to waive the giving of notice. On the other hand, if the breach was so grave as to be irreparable and incurable, the giving of notice would be a useless gesture." *Id.* at 747–48. The court went on to note that "[i]n the instant case, if the charges of disloyalty and dishonesty are true, it would be impossible for Wieland to remedy the breach, or to expect appellants to continue to perform the contract." *Id.* at 748. Thus, the court's use of the common law principle was essentially to give meaning to the

parties' intent when the parties used non-mandatory language in their agreement.

However, 7–Eleven is correct that the *Leghorn* court relied on *Young Travelers Day Camps, Inc. v. Felsen*, 118 N.J.Super. 304, 287 A.2d 231 (1972) in reaching its decision, a case similar to the instant one in that there was no precedent found within that jurisdiction regarding whether a contract could immediately be terminated despite notice and cure contractual provisions. The court there first noted the general contract principle that "[a] material breach of contract on the part of one party entitles the other party to terminate it." *Id.* at 310, 287 A.2d 231. However, the court acknowledged that the majority view was that if the contract contained notice and cure provisions, that was the exclusive means by which a party could terminate that contract. *Id.* at 310–11, 287 A.2d 231. The minority view, as the court put it, is that "[u]nless a contract provision for termination for breach is in terms exclusive, ... it is a cumulative remedy and does not bar the ordinary remedy of termination for 'a breach which is material or which goes to the root of the matter or essence of the contract.'" *Id.* at 311, 287 A.2d 231.

In applying the minority view in relation to the contract at issue, the *Young Travelers* court noted that the contract, similar to the one here, did not indicate whether the notice and cure provisions constituted the exclusive method of termination. *Id.* at 311–12, 287 A.2d 231. That case involved a 'franchise agreement' in which the defendant was given a license to establish children's summer day camps according to a system developed by the plaintiff. *Id.* at 305, 287 A.2d 231. The defendant's job was to enroll campers for the summer season. *Id.* at 307, 287 A.2d 231. Yet, his procurement of new camper contracts drastically decreased after he expressed his desire to get out of the contract to pursue a different job, and he failed to deliver the contracts he had procured until a few days before the summer camp season. *Id.* at 307–09, 287 A.2d 231. Due to this late delivery, none of the contracts could be performed and the money had to be refunded to all of the parents. *Id.* at 308, 287 A.2d 231. The court found that this "breach was not merely material, it was irreparable". *Id.* at 314, 287 A.2d 231. It was clear to the court that the notice and cure provisions in the 'franchise agreement' "w[ere] not intended to be the exclusive remedy for matters which could not be rectified." *Id.*

The Court is persuaded by the rationale of the *Young Travelers* court. In addition, there is overwhelming support for this rationale from other jurisdictions, as noted above. There is nothing in the franchise agreements, at issue here, which indicates that the notice and cure provisions are to be the *exclusive* remedies for material breaches. Similarly, there is nothing in the agreements that speak to matters which are incurable except for violation of any Anti–Terrorism law. *See* Jt. Exs. 1, 2 at ¶ 26(a)(7). The Court agrees that giving a contracting party an opportunity to cure that which cannot be cured would be a useless exercise. And though the Court would have expected a sophisticated company like 7–Eleven to have included in their franchise agreements a provision that speaks generally to the notion that conduct irrevocably damaging to the trust between the parties would be incurable, the Court also recognizes that it would be difficult to outline all of the circumstances that might apply.

In this case, the Court finds credible 7–Eleven's testimony that Defendants' conduct was so egregious and damaging to their franchise relationship, that there was nothing that they could do to rectify the

damage. Therefore, immediate termination of the agreements by 7–Eleven, notwithstanding the notice and cure provisions was proper.

■ Here, 7–Eleven's reasons for the immediate contract terminations were three-fold. First, Defendants intentionally failed to accurately report sales at Stores '44 and '37. 7–Eleven's review of several weeks of video during its investigation of the stores showed Mr. Kapoor using the Cancel Age Verification function on the POS system to improperly void sales. Pl. Exs. 4, 7 & 8. This investigation revealed more than one hundred other instances of similar, video-recorded proof of this misconduct. *Id.* Indeed, this conduct had been ongoing for at least fourteen months and as many as 4,000 sale transactions were either not reported or falsely reported in like fashion to 7–Eleven.[8] Mr. Kapoor did not deny this conduct or that it was done intentionally. Doc. 21–3, Kapoor Decl. ¶ 1. He is correct that the franchise agreements provided for three business days notice as well as three business days to cure for this type of breach. *See* Jt. Exs. 1, 2 at ¶ 26(a)(4)(b). However, the Court finds Mr. Kapoor's conduct, in and of itself, to be egregious when taking into account the amount of inaccurately reported sales, the length of time within which this conduct occurred, and the fact that it was done intentionally. Mr. Kapoor has denied that he was inaccurately reporting sales in order to steal funds from 7–Eleven. Doc. 21–3, Kapoor Decl. ¶ 1. Instead, Mr. Kapoor contends, 7–Eleven was putting constant pressure upon him to increase the stores' food sales. In order to satisfy this request, Mr. Kapoor argues that he was merely entering as food sales those products that should have been entered as cigarette sales to make it appear as if the stores' food sales were increasing. This excuse, Mr. Kapoor contends, prevents his conduct from rising to the level of irreparable damage.

However, the Court does not find this "pressure" explanation to be credible given that this conduct commenced a mere three or four months after Mr. Kapoor opened Store '44. Moreover, 7–Eleven's evidence belies this excuse. Specifically, 7–Eleven's audit analyses of the Stores do not show fresh food category overages as would be expected if these phantom sales of food were occurring. *See* Pl. Exs. 5, 6. Regardless of the verity of Mr. Kapoor's explanation, his actions remain fundamentally dishonest, irrespective of his stated intentions. As noted above, the Court finds the totality of the conduct in and of itself goes beyond a mere breach that can be cured under the contract. As 7–Eleven pointed out, it relies on the accuracy of the information the franchisee provides·it and its ability to trust that information is essential to the intended functioning of the franchise relationship. Because of Mr. Kapoor's conduct, 7–Eleven no longer trusts him to provide it with accurate information, which is understandable given these facts. Moreover, Mr. Kapoor's attempt to "cure" this breach, namely, to cease the behavior, does little to repair the trust that Mr. Kapoor eradicated over a period of eighteen months.

Second, 7–Eleven accuses Mr. Kapoor of manipulating the results of 7–Eleven's physical inventory audits in order to avoid detection of his inaccurate sales reporting conduct. Specifically, 7–Eleven accuses Mr. Kapoor of bringing inventory into the stores for the specific purpose of having it included in the audit so that an inventory variance would not be detected by 7–Elev-

---

8. The investigation revealed that Defendants had erroneously voided sales transactions more than 1,350 times between July 10, 2012 and February 19, 2013.

en. *See* Pl. Exs. 9, 10. This is reflected, 7–Eleven contends, by the significant category overages and shortages shown on the inventory analyses, which are indicative of unreported sales of some types of products and unreported acquisitions of other types of products. *See* Pl. Exs. 5, 6. There were some instances in which 7–Eleven took undercover photos of Mr. Kapoor unloading merchandise from his car and taking it into Store '44 just before an inventory audit and then removing this inventory from the store immediately after the audit concluded. Doc. 22, Supp. Hall Decl. ¶ 9; Sec. Supp. Hall Decl. ¶¶ 4–5.

Mr. Kapoor denies that he was engaging in inventory manipulation in order to mask his inaccurate sales reporting. Kapoor Decl. ¶¶ 20–21. Where 7–Eleven observed him taking inventory into Store '44 just prior to an audit and removing it directly afterwards, he avers that the immediate removal of the merchandise was due to the fact that its storage in both stores was unsecure and that it was removed in order to be stored in the safety of Mr. Kapoor's personal residence during the stores's closing hours. He contends that any inventory discrepancy was probably because of theft at the stores. *Id.* At the motion hearing, Mr. Kapoor produced reports he made to the police on several occasions regarding theft at the stores. However, 7–Eleven presented testimony that it had no record that any such reports were made even though Mr. Kapoor was required under the franchise agreements to inform 7–Eleven of any thefts at the stores and of any police reports made.

7–Eleven also accused Mr. Kapoor of purchasing the inventory that was allegedly used to engage in manipulation "off the books," which Mr. Kapoor denied. Supp. Hall Decl. ¶ 9; Sec. Supp. Hall Decl. ¶¶ 4–5; Kapoor Decl. ¶¶ 20–21. Mr. Kapoor says that 7–Eleven authorizes a certain percentage of franchisee inventory to be purchased from non–7–Eleven vendors. Mr. Kapoor is required to provide the receipts from those outside vendor purchases to 7–Eleven. In this instance, 7–Eleven has no record of a receipt for this vendor purchase, nor was Mr. Kapoor able to provide a copy of the receipt at the evidentiary hearing. Doc. 23, Supp. Kapoor Decl. ¶¶ 3–4.

In any event, Mr. Kapoor contends that any breach relating to inventory was also provided for in the agreement. Specifically, the agreements provide for thirty business days notice and thirty business days to cure for inaccurate inventory reporting. Doc. 1–2, 1–3, Franchise Agreements, ¶ 26(a)(2)(e). The Court finds 7–Eleven's evidence to be more credible here, especially when weighed against the testimony of Mr. Kapoor that he asked outside vendors to deliver product to his personal residence instead of to either of his stores purportedly because he was concerned with theft at the stores.

Finally, Mr. Kapoor also employed several persons at the stores whom he knew were ineligible to work in the United States. To have 7–Eleven process payroll, Mr. Kapoor provided it with social security account numbers that he knew had not been assigned to these employees by the Commissioner of Social Security. *See* 42 U.S.C. § 408(a)(7)(b) (making it a felony crime to knowingly provide a false social security number to another). By providing this false information to 7–Eleven, Mr. Kapoor involved it, albeit unwittingly, in criminal activity. Moreover, Mr. Kapoor was unable to tell the Court whether the social security numbers he used had already been assigned to other people or were unassigned numbers.

Mr. Kapoor admits hiring ineligible individuals for his stores. Kapoor Decl. ¶¶ 22. His explanation here is that he witnessed

this practice at other 7–Eleven stores where he worked before he became a franchise owner, and believed it was condoned. Specifically, Mr. Kapoor testified at the motion hearing that at those other 7–Eleven stores, 7–Eleven would not always check the required identification and other verification for the I–9 form, the Employment Eligibility Verification document issued by the federal government that potential employees must satisfy before an employer can hire them, especially if the individual indicated that he or she did not possess the information at the moment. In that event, 7–Eleven would just ask them to bring the information at a later date, Mr. Kapoor testified. The Court does not find Mr. Kapoor's explanation credible. All three of the undocumented workers Mr. Kapoor employed were family members—his brother, cousin, and wife— all individuals that he clearly knew were undocumented. Thus, this was not a situation where his adherence to the I–9 form was lax, as he described. On the contrary, he intentionally hired individuals he knew to be undocumented. In fact, he even put his brother in charge of Store '37 as manager.

Mr. Kapoor points out that the contract provides for thirty business days notice and a thirty business day cure for this breach under the contract. *See* Doc. 1–2, 1–3, Franchise Agreements, ¶ 26(a)(2)(i). This is a general provision relating to the operation of the stores in the agreements. Mr. Kapoor contends that he "cured" this breach within three business days by firing the ineligible employees. The Court must agree with 7–Eleven that this was no cure because there is none for this blatantly fraudulent and seemingly criminal conduct.

In sum, 7–Eleven has established that Defendants were engaged in widespread fraudulent activities at their stores. This fraudulent activity went to the essence of the parties' agreement, destroyed all sense of trust between Defendants and 7–Eleven and cannot reasonably be cured. Mr. Kapoor has not accounted to 7–Eleven for the unreported sales, has not furnished it with accurate inventory records, and has not corrected the false employment information. Significantly, Mr. Kapoor does not address 7–Eleven's distrust of him, much less suggest that his relationship with 7–Eleven is capable of repair. Thus, while the franchise agreements provide for termination after notice, that method of termination is not by its terms exclusive and such notice would have been in any event a "useless gesture." *See Leghorn*, 289 So.2d at 748. Consequently, 7–Eleven's June 20, 2013 immediate termination of the franchise agreement was proper, and the franchise agreements were terminated as of that date.

### B. Preliminary Injunctive Relief (Lanham Act Claims)

#### 1. Likelihood of Success on the Merits

■ 7–Eleven has two claims under the Lanham Act—trademark infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125(a). *See* Compl. 7–Eleven seeks an injunction to prohibit the reproduction of its registered trademark in violation of 15 U.S.C. § 1114(1), and to prohibit the false designation of the source or origin of a business, service or good in violation of 15 U.S.C. § 1125(a). 7–Eleven must demonstrate a substantial likelihood that it would be successful on the merits of its Lanham Act claims. "In order to demonstrate a prima facie case of trademark infringement and unfair competition, a plaintiff must show that: (1) it owns the trademarks at issue; (2) defendants used the marks without authorization; and (3) defendants' use is likely to cause confusion, mistake, or deception

as to the source, affiliation, or sponsorship of defendants' goods." *Ford Motor Co. v. O.E. Wheel Distributors, LLC,* 868 F.Supp.2d 1350, 1361 (M.D.Fla.2012) (citing *Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1178 (11th Cir.1994) and *Dieter v. B & H Indus. of Sw. Florida,* 880 F.2d 322, 326 (11th Cir.1989)).

As noted above, 7–Eleven owns a variety of well-known and federally registered marks, including 7–Eleven®, Slurpee® and Big Gulp®. Stip. ¶ 2. Defendants are using 7–Eleven's marks and, as discussed above, the franchise agreements are validly terminated, making such use unauthorized. *See* Pl. Exs. 1, 2 at ¶ 28(a)(4) (obligating franchisee upon termination to "cease using the Service Mark[s], the Related Trademarks, and all elements of the 7–Eleven System...."). Indeed, Defendants continue to operate convenience stores from the same locations as before the termination under the 7–Eleven brand and using 7–Eleven trademarked products. This conduct has been held by the Eleventh Circuit to create a "certainty of confusion" among consumers that the terminated franchisee's products and business are affiliated with the franchisor when, in fact, they are not. *McDonald's,* 147 F.3d at 1309–10; *see Burger King Corp. v. Majeed,* 805 F.Supp. 994, 1002 (S.D.Fla.1992) ("well-settled doctrine [holds] that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement.")

The critical issue here is likelihood of confusion, mistake, or deception between the registered mark and the infringing mark. 7–Eleven has clearly met this standard. Based on the record, 7–Eleven has demonstrated a substantial likelihood of success on the merits with regard to its trademark claims.

## 2. Irreparable Harm

"A showing of irreparable injury is 'the sine qua non of injunctive relief.'" *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000) (citing *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990)). "[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." *Ferrellgas Partners, L.P. v. Barrow,* 143 Fed. Appx. 180, 190 (11th Cir.2005) (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998)). "Irreparable injury can also be based upon the possibility of confusion." *Id.*

In fact, in trademark cases, "a sufficiently strong showing of likelihood of confusion ... may by itself constitute a showing of ... substantial threat of irreparable harm." *McDonald's,* 147 F.3d at 1310 ("McDonald's faces damage to its own reputation and loss of customers caused by [the franchisee's] distribution of an allegedly inferior ... product held out to be McDonald's sanctioned products.... We can conceive of no realistic way to determine damages under these circumstances."); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982, 986 (11th Cir.1995) ("There is no doubt that the continued sale of thousands of pairs of counterfeit jeans would damage [the plaintiff's] business reputation and decrease its legitimate sales."); *Sundor Brands, Inc. v. Borden, Inc.,* 653 F.Supp. 86, 93 (M.D.Fla.1986) ("The law is settled that the existence of a likelihood of confusion constitutes irreparable injury, as a matter of law, sufficient to satisfy the requirements of Fed.R.Civ.P. 65.").

Even in the absence of such presumptions, 7–Eleven has established actual confusion and consequent continuing and irreparable harm to its goodwill and reputation by the numerous post-termination

customer complaints made against Defendants' stores because 7–Eleven cannot control the quality of Defendants' services and products. *See* Pl. Ex. 17. In circumstances like this, even the prospect of loss of ability to control reputation sufficiently demonstrates irreparable harm. *See Ferrellgas Partners*, 143 Fed.Appx. at 191 (a plaintiff need not show that the infringer damaged the plaintiff's reputation; it is the loss of control of one's reputation by the adoption of the plaintiff's mark that supplies the substantial threat of irreparable harm); *Burger King v. Cabrera*, No. 10–20480–Civ, 2010 WL 5834869, at *9 n. 7 (S.D.Fla. Dec. 29, 2010) ("In trademark and trade dress cases specifically, if one trademark user cannot control the quality of the other trademark users's goods and services, he can suffer irreparable harm. This type of irreparable harm can be measured by the loss of goodwill and damage to reputation, both of which can be traced to loss of control over the alleged trademark infringer's products. This loss of control constitutes immediate irreparable harm.") (*quoting DS Waters of America, Inc. v. Princess Abita Water, L.L.C.*, 539 F.Supp.2d 853, 863 (E.D.La. 2008)).

Based on the record, the Court finds that there is sufficient evidence of irreparable harm that Plaintiff may suffer if the preliminary injunction is not granted.

### 3. Balance of Harms

The relevant inquiry in assessing the weight of potential harms is whether the probable loss of consumer goodwill outweighs Defendants' losses arising from their inability to use 7–Eleven's trademarks until a decision on the merits is reached. *Davidoff & Cie, S.A. v. PLD International Corp.*, 263 F.3d 1297, 1304 (11th Cir.2001). Defendants' frame their harm in terms of having to completely surrender the stores, which they argue will

leave them with nothing, including the ability to defend themselves against 7–Eleven's allegations because their livelihood is dependent upon their income from the stores. 7–Eleven's livelihood, on the other hand, Defendants argue, is not dependent on its possession of the stores. Its injury, Defendants understand, is to its goodwill and reputation.

When faced with similar factual situations in which the franchisee has breached the terms of its franchise agreement, courts regularly find that a franchisee cannot then be heard to complain of harm from an injunction preventing further use of the franchisor's trademarks. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir.1992) (finding that while the franchisee was certainly harmed by the threat of loss of his franchise, his "self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark"); *Burger King*, 805 F.Supp. at 1006 (applying same reasoning in granting preliminary injunction). In this light, weighing Defendants' essentially self-inflicted injuries against the immeasurable losses to Plaintiff's goodwill, the Court finds that the balance of harms "weighs decisively in favor of granting the requested injunctive relief." *Dunkin' Donuts Franchised Restaurants, LLC v. KEV Enterprises, Inc.*, 634 F.Supp.2d 1324, 1336 (M.D.Fla.2009); *see also Clayton v. Howard Johnson Franchise Systems, Inc.*, 730 F.Supp. 1553, 1561–62 (M.D.Fla.1988) ("[infringer] would suffer no legitimate harm since the preliminary injunction would only prevent them from using marks which they are not entitled to use.").

### 4. Public Interest

Plaintiff argues that, without an injunction, the consumer confusion being caused by Defendants will continue as they have no realistic means of distinguishing be-

tween a legitimate 7–Eleven and the stores being operated by Defendants. Plaintiff contends that a preliminary injunction in this case "is not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace." *Davidoff*, 263 F.3d at 1304; *see also BellSouth Advertising & Publishing Corp. v. Real Color Pages, Inc.*, 792 F.Supp. 775, 785 (M.D.Fla.1991) (in trademark infringement and unfair competition cases, "a third party, the consuming public, is present and its interests are paramount."). Defendants counter that issuing an injunction to 7–Eleven would be adverse to the public interest because Plaintiff's termination of the agreement was invalid. The Court has concluded above that this argument is without merit and finds that issuing a preliminary injunction in this matter would not adversely affect the public.

### C. Preliminary Injunctive Relief (Restrictive Covenant Claim)

Paragraph 5(d)(2) of the ⸱ franchise agreements is a restrictive covenant against competition. *See* Jt. Exs. 1 & 2 at ¶ 5(d)(2). In relevant part, it prohibits Defendants from maintaining, operating or engaging in a "Competitive Business" located at the same premises, in this case the sites of Store '44 and Store '37, or any site of a former 7–Eleven store, for a continuous period of one year following termination. *Id.* A "Competitive Business" is defined as a business that is the same as or similar to a 7–Eleven store, except a 7–Eleven store operated under a valid agreement with 7–Eleven. *See id.*, Ex. E.

### 1. Likelihood of Success on Merits

■■■■ In Florida, restrictive covenants are enforceable to the extent they are reasonable in time and geographic scope and necessary to protect a "legitimate business interest," which includes confidential business information, a substantial relationship with specific prospective/existing customers, and goodwill associated with a trademark or specific geographic market or trade area. Fla. Stat. § 542.335. A party seeking to enforce a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant and that the restriction is reasonably necessary to protect those legitimate business interests. Fla. Stat. § 542.335(1)(b) & (c).

■■■■ 7–Eleven argues that the restrictive covenants are reasonably necessary to protect such business interests as: 1) the protection of its trademarks and goodwill, 2) preventing Defendants' unauthorized use of confidential business information obtained through the franchise—business operations manuals, specialized training material, associated 7–Eleven advertising and sales material,[9] and 3) preserving and protecting important customer relationships which associate 7–Eleven trademarks with the franchisees. The covenant prevents confusion and diversion of business resulting from Defendants' continued use of the franchises, 7–Eleven argues.

While 7–Eleven has advanced an assortment of legitimate business interests advanced by its restrictive covenant, discussion of only one of them is necessary and dispositive: "legitimate business interests" include the protection of customer, patient or client goodwill associated with an ongoing business by way of a trademark, service mark or within a specific geographic location or marketing or trade area. *See* Fla. Stat. § 542.335(1)(b)(4); *see USI In-*

---

**9.** Though this information does not constitute a trade secret, 7–Eleven argues that it allows Defendants an unfair and competitive advantage.

surance Services of Florida, Inc. v. Pettineo, 987 So.2d 763, 766 (Fla. 4th Dist.Ct. App.2008) (enforcing a non-compete that sought to protect substantial relationships with specific prospective or existing customers and goodwill associated with an ongoing business).

In this instance, 7–Eleven's goodwill interest is unmistakable and under threat of imminent harm. It is uncontroverted that 7–Eleven enjoys a substantial presence and goodwill in the convenience store industry and, in fact, that was a principal reason for Mr. Kapoor's interest in becoming a franchisee. 7–Eleven's goodwill interest is suffering from Mr. Kapoor's continued operation of the store evidenced by the several customer complaints shown in Plaintiff's Exhibit 17. Indeed, 7–Eleven's goodwill interest is all the more significant in this case because it owns the real property and store premises from which Mr. Kapoor is currently operating the stores, notwithstanding his obligation to surrender those premises immediately upon termination. See Jt. Exs. 1, 2 at ¶ 28.

Once having demonstrated the existence of "legitimate business interests" and that the covenants not to compete are reasonably necessary to protect such interests, the burden shifts to Defendants "to show that the restriction is 'overbroad, overlong, or otherwise not reasonably necessary to protect' the established interests" of 7–Eleven. North American Products Corp. v. Moore, 196 F.Supp.2d 1217, 1228 (M.D.Fla.2002) (quoting Fla. Stat. § 542.335(1)(c)). Defendants have made no such showing. The geographic reach of the restrictive covenant is tied merely to the premises of Store '44 and Store '37 or another location that was formerly a 7–Eleven store during the past two years. See Jt. Exs. 1 & 2 at ¶ 5(d)(2). And, the length of the restrictive covenant, one year, is presumptively reasonable. See Fla. Stat. § 542.335(1)(d)(2) ("In the case of a restrictive covenant sought to be enforced against a former distributor, dealer, franchisee, or licensee of a trademark or service mark ... a court shall presume reasonable in time any restraint 1 year or less in duration and shall presume unreasonable in time any restraint more than 3 years in duration.").

The Court finds that Plaintiff has a substantial likelihood of success on the merits of its restrictive covenant claims.

### 2. Irreparable Harm

Violation of an enforceable restrictive covenant creates a presumption of irreparable harm, under Section 542.335(1)(j), Florida Statutes, and an injunction is the common and preferred remedy. See North American Products, 196 F.Supp.2d at 1230–31; Environ. Serv., Inc. v. Carter, 9 So.3d 1258, 1261 (Fla. 5th Dist.Ct.App. 2009) ("The usual remedy in cases involving a valid covenant not to compete is injunctive relief since it is extremely difficult for a court to determine what damages are caused by breach of the covenant."). In addition to this presumption, which Defendants have not rebutted, the harm to 7–Eleven is manifest. Defendants are operating stores under 7–Eleven's brand without its permission. In so doing, they are pirating the goodwill associated with 7–Eleven and causing it immeasurable damage. 7–Eleven has established irreparable harm here.

### 3. Balance of Harms

The continuing harm to 7–Eleven and its marks outweighs any countervailing harm to Defendants if they are enjoined from violating the restrictive covenants. 7–Eleven argues that it will lose the value of its trademarks and the associated goodwill, and will have difficulty entering the market served by the former franchisees. In addition, 7–Eleven argues that other fran-

chisees will take a lack of enforcement as a concession to the breach.

Here again, Defendants' asserted harm is economic, but self-inflicted, whereas the continuing harm to 7–Eleven is immeasurable. *See* Fla. Stat. § 542.335(g)(1) (prohibiting the court from considering individualized economic or other hardship that might be caused to the person against whom enforcement is sought). The Court therefore finds that the balance of harms weighs in favor of an injunction.

#### 4. Public Interest

■ A preliminary injunction enforcing the restrictive covenants will serve the public interest, because enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations. *See Athlete's Foot Brands, LLC v. Turner Phase IV, LLC*, 581 F.Supp.2d 1250, 1253 (S.D.Fla.2008) (granting a preliminary injunction and stating that a franchisee's inability to sell similar goods within ten miles for a one year period was not, on the face of the non-compete provision of the franchise agreement, against public policy). As Florida has recognized by the enactment of Section 542.335, there is an especially strong public interest in enforcing restrictive covenants, as that promotes legitimate business. And, in order to invalidate an otherwise enforceable restrictive covenant based on public policy, a defendant must demonstrate that the policy interest "substantially outweighs" the need to protect an established, legitimate business interest. Fla. Stat. § 542.335(1)(i). Defendants have not done so here and the public interest is served by requiring them to honor the post-termination restrictive covenants in the franchise agreements.

#### D. Bond

■ "The [C]ourt may issue a preliminary injunction ... only if the movant gives security in an amount that the [C]ourt considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined...." Fed.R.Civ.P. 65(c); *see also* Fla. Stat. § 542.335(1)(j) ("No temporary injunction shall be entered unless the person seeking enforcement of a restrictive covenant gives a proper bond...."). "The amount of an injunction bond is [a matter ultimately] within the sound discretion of the district court." *See Carillon Importers, Ltd. v. Frank Pesce Int'l Group, Ltd.*, 112 F.3d 1125, 1127 (11th Cir.1997). The Court finds that $200,000.00 is a sufficient amount to compensate Defendants if they are wrongfully enjoined.

### V. CONCLUSION

7–Eleven has met its burden as to the prerequisites for preliminary injunctive relief. Accordingly, it is hereby

**ORDERED** as follows:

1. Plaintiff's Motion for Preliminary Injunction (Doc. 10) is **GRANTED.**

2. Defendants Pursharth Kapoor and Kapoor Brothers, Inc., their agents, servants and employees, and those people in active concert or participation with them who receive actual notice of this preliminary injunction, by personal service or otherwise, be and they **ARE HEREBY RESTRAINED AND ENJOINED** from directly or indirectly:

   (a) Using or otherwise infringing upon any of 7–Eleven's marks, including 7–Eleven®, or any confusingly similar trademark, service mark, logo or trade name;

   (b) Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of Defendants' businesses, goods, or services;

(c) Causing a likelihood of confusion or misunderstanding as to Defendants' affiliation, connection or association with 7–Eleven and its franchisees or any of their goods and services; and

(d) Maintaining, operating, engaging in or having any financial or beneficial interest in a convenience store business located at: (i) 1105 Courtenay Parkway, Merritt Island, Florida 32593; (ii) 400 W Merritt Island Causeway, Merritt Island, Florida 32592; or (iii) the site of any former 7–Eleven store within 2 years of its last being operated as a 7–Eleven.

3. Plaintiff shall post a bond in the amount of **TWO HUNDRED THOUSAND DOLLARS ($200,-000.00)**, or, in lieu of bond, Plaintiff may submit a cash deposit of $200,000.00 with the Clerk of Court for deposit into the Registry. The bond or cash deposit held in the Registry shall stand as security to recover any attorney's fees and damages incurred by Defendants in the event it is subsequently determined that the Preliminary Injunction should not have been granted. This injunction will take effect upon the posting of this bond. Plaintiff may, by motion, seek dissolution of this security and return of the cash deposit upon proper grounds.

It is **FURTHER ORDERED** that this injunction shall continue in force and effect pending trial in this action or further order of the Court.