118 N.J. Super. 304 (1972)
287 A.2d 231
YOUNG TRAVELERS DAY CAMPS, INC., A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF,
v.
MICHAEL FELSEN, DEFENDANT.
Superior Court of New Jersey, District Court, Essex County.
Decided February 3, 1972.
*305 Messrs. Diamond & Pitman, attorneys for plaintiff.
Messrs. Schenck, Price, Smith & King, attorneys for defendant.
YANOFF, P.J.D.C.
This issue arises on a motion for a new trial after a trial before me which resulted in a judgment for plaintiff in the sum of $513.93 on the main suit, and a judgment for plaintiff, also, on the counterclaim.
The principal question raised is one of law, dealing with the effect of a contract provision authorizing termination upon five days written notice. It is uncontradicted that such notice was not given by plaintiff. Defendant's contention is that the notice provision makes it the exclusive method for terminating the contract, and therefore plaintiff had no right to terminate the contract. There is no case in New Jersey on the subject and analysis of decisions outside this jurisdiction reveals a conflict of authority.
Although I rendered an oral opinion analyzing the facts in the matter, reference to the factual context is necessary for a proper understanding of the problem.
On January 29, 1970 plaintiff Young Travelers and defendant Felsen entered into a "franchise agreement." The agreement is an elaborate instrument which licenses Felsen in the establishment of children's summer day camps, according to a system developed and promoted by Young Travelers.
The contract was drawn by Young Travelers. It contains elaborate provisions regulating licensee's conduct. Among *306 other things, it requires licensee to make an initial cash payment, giving him a choice of various methods. In this case licensee chose Schedule F which required him to pay $1,000: $250 on execution of contract; $250 on start of training to be supplied by Young Travelers; and $500 on the first $3,000 of sales, plus varying percentages of net profits. This payment was to be made by depositing the fund in a joint checking account, to be drawn upon by the joint signatures of licensor and licensee.
The contract provides:
Beginning with the date of this agreement or March first, whichever is later, and continuing until June 30 of each year, the licensee shall use his best efforts in the time before and/or after the time spent in his usual occupation to solicit business for the forthcoming summer's operation and to perform all other preparations necessary to the beginning of the summer's operations. * * *
The Contract contains two specific methods of termination: one, for failure to pay licensor a minimum amount of profit, in which case licensor has the right to terminate by written notice; the other, the provision involved here:

XXIII. RIGHTS AND OBLIGATIONS OF THE PARTIES ON TERMINATION

(a) If the Licensee shall become in default under any finance or security agreement, deed of trust or lease covering the Franchise and any tangible or intangible property used in the conduct and operation thereof, or shall be adjudicated a bankrupt, or shall make an assignment for the benefit of creditors, or if a receiver shall be appointed to take charge of the Licensee's affairs, or if the Licensee shall default in the performance of any covenant or agreement made hereunder, as to standards of operation, failure to obtain consent of the Licensor where required hereunder, payments of amounts due hereunder or otherwise, and such default shall not be remedied to the Licensor's satisfaction within five (5) days after notice of such default, then the Licensor may thereupon terminate this Agreement and all rights hereunder of the Licensee, but such termination shall not affect the obligations of the Licensee to take action or to abstain from taking action after termination hereof, in accordance with this Agreement.
*307 Young Travelers' complaints about Felsen fall into three categories:
First, that he failed to make the payments required by Schedule F of the contract. Payment of $250 on signing is admitted, but Young Travelers denies that the second payment of $250 due at commencement of training was ever made. Training commenced in February. Felsen concedes that the second payment and the opening of the joint account did not occur until March or April 1970. Felsen says that he had oral permission to delay the second payment and the opening of the joint account. My decision does not rest on this point, and the issue of credibility need not be resolved.
Second, that Felsen failed to use his best efforts to further the purposes of the contract. The evidence as to this is clear. Felsen was obligated, in order to make the contract profitable for both parties, to enroll campers for the summer season. In all, Felsen procured 19 contracts. Of these, 5 were executed in March, 12 in April, none in May, and 2 in June.
Felsen's attitude to the contract is of importance. Approximately April 20 he met with his attorney, Barry Mandelbaum, to discuss means for getting out of the contract because he wanted to take a position in another field. As the result Mandelbaum wrote Young Travelers a letter dated April 29, 1970 in which he said that he wished to discuss with Young Travelers "the contract and its termination." The evidence indicates also that even prior to this Felsen had communicated to a representative of Young Travelers his desire to get out of the contract in order to take another position.
In reply to Mandelbaum's letter Frederick J. Damski, a lawyer for Young Travelers, under date of May 6, 1970 wrote Mandelbaum directing Felsen to discontinue the use of Young Travelers' trade name and to return all property of Young Travelers. At the termination of the letter, the writer stated: "Kindly communicate with me regarding the means by which we can effectuate the termination of the franchise agreement." Whether this letter constituted an attempt to terminate *308 the contract is not important, because after it conversations ensued between Mandelbaum and Damski which apparently effected a partial reconciliation. Thus, under date of May 14, 1970 Mandelbaum wrote Damski that Felsen wished to continue with the contract and was making every effort to comply with its requirements. This letter concluded by stating: "I believe the parties can resolve any outstanding differences between them, and I hope you will advise your client to comply and perform the contract." The reconciliation was of sufficient potency so that Felsen continued to attend training sessions and conferences held under the auspices of Young Travelers until almost the end of June.
Among the meetings he attended was one on June 25, at which there was an acrimonious exchange between Young Travelers' representative and Felsen, as the result of which Felsen left before the end of the meeting.
Young Travelers' third major complaint about Felsen is that he failed to deliver to it the camper contracts which he procured. Felsen admits that it was not until the very end of June that they were delivered. Young Travelers takes the position that the delivery of the contracts to it was vital for its preparation for the ensuing summer season. Felsen disputes this; however, I have no doubt that Young Travelers had to know how many and the location of the campers it had to make provision for in order to prepare for the forthcoming season well in advance of the season's commencement on July 1. Felsen said that he had the contracts with prospective campers with him on June 25. However, he did not deliver them. The following day Felsen met with Young Travelers' representative and delivered the camper contracts to him.
None of the camper contracts was performed, and Young Travelers returned to the parents who had signed them all the money which they had paid.
It is crystal clear that despite the parties reconciliation in the middle of May, and Felsen's attorney's statement that Felsen intended to perform the contract, that Felsen *309 did virtually nothing during May to implement the contract. He says that he made unsuccessful attempts to obtain camper contracts, but the fact is that not a single contract was signed during that month. It is difficult to believe that if he had been able to sign 12 contracts during the month of April, he was not able to procure a single contract during the month of May. Additionally, his conduct in failing to turn over the contracts to Young Travelers, while not expressly in violation of a contract term, was certainly a violation of its spirit. I can draw no conclusion other than that Young Travelers was entitled to know how many campers it had to plan for during the camping season.
The situation is somewhat complicated by the fact that under date of July 14 the president of Young Travelers wrote Felsen's attorney a letter stating:
It is our position that you effectively abandoned your obligations under your franchise agreement with us on or before May 6th, 1970.
In order that there be no further misunderstanding, please be advised that your agreement with us has been terminated May 11th, 1970.
The most that can be made of it, however, is that the date of termination may have been erroneously set too soon. Certainly by the end of May there existed a material breach of contract on the part of Felsen, which, unless barred by a contract provision, entitled Young Travelers to terminate the agreement. Young Travelers' ignorance of the breach would not prevent it from relying upon it. Restatement, Contracts (1932), § 278 at 410. From the inception of the contract Felsen indicated an unwillingness to abide by its terms. While the monetary payment is not crucial, the fact is that it was not made on time, a circumstance which undoubtedly colored subsequent relations between the parties. The fact is also that at the end of April Felsen manifested a strong desire to get out of the contract. The fact that he changed his mind after realizing that he could not do so with impunity undoubtedly did not effect the suspicion in Young Travelers' mind that he did not intend to perform. This was *310 confirmed by two circumstances: first, his failure to deliver copies of contracts signed with campers, and second, the fact that he wrote not a single contract during the month of May. The best that can be said for Felsen's position is that he nominally protested his willingness to perform the contract but in fact did nothing to implement it after he had first inquired as to how he could get out of the contract.
A material breach of contract on the part of one party entitles the other party to terminate it. In Ross Systems v. Linden Dari-Delite, 35 N.J. 329 (1969), the court said:
If the breach is material, i.e., goes to the essence of the contract, the non-breaching party may treat the contract as terminated and refuse to render continued performance [at 341]
Accord. 2 Restatement, Contracts (1932) § 399 at 274-276. Cf. Giumarra v. Harrington Heights, 33 N.J. Super. 178, 191 (App. Div. 1954), aff'd 18 N.J. 548 (1955).
Failure to procure campers in May and to deliver contracts, in fact procured, until the inception of the camp season, deprived Young Travelers of the essence of this contract.
Felsen's answer is that material breach or no, the law is that where a contract contains a provision such as that quoted, the only method of terminating is by the notice required under such provisions.[1] There is no case on this subject in New Jersey, and the law outside the State is in dispute. The majority view is that where such a provision is included in the contract, it constitutes the exclusive means of terminating the contract. Carleno Coal Sales, Inc., v. Ramsay Coal Co., 129 Colo. 393, 270 P.2d 755 (Sup. Ct. 1954); Northwest Water Corp. v. City of Westminster, 164 Colo. 61, 432 P.2d 757 (Sup. Ct. 1967); Johnson v. Kahrs, *311 199 Ga. 365, 34 S.E.2d 503 (Sup. Ct. 1945); Tomsheck v. Doran, 126 Mont. 598, 256 P.2d 538 (Sup. Ct. 1953). This view is espoused in 6 Corbin, Contracts (1962 ed.), § 1266 at 64. The minority view is set forth in Foster-Porter Enterprises, Inc., v. DeMare, 198 Md. 20, 81 A.2d 325 (Ct. App. 1951), and is the view set forth in 6 Williston, Contracts (3d ed. 1962), § 842, n. 1, at 165, which is supported by the holding in Lyon v. Pollard, 87 U.S. (20 Wall.) 403, 22 L.Ed. 361 (1874). Arrayed against each other are the two leading authorities on contract law. The majority view takes the position that unless notice is given in conformity with the contract, the contract continues regardless of the extent of breach and the only remedy of the party against whom the breach has been committed is a suit for damages. The minority view is set forth in Foster-Porter Enterprises in considered dictum as follows:
Unless a contract provision for termination for breach is in terms exclusive, Bartol v. Gottlieb-Bauernschmidt-Straus Brewing Company, 129 Md. 32, 98 A. 286, it is a cumulative remedy and does not bar the ordinary remedy of termination for "a breach which is material, or which goes to the root of the matter or essence of the contract". Williston, § 842; cf. Keystone Engineering Company v. Sutter, 196 Md., 620, 78 A.2d 191, 195. Section 10 is similar to usual default provisions in bond mortgages and other instruments under which securities are issued. Such default provisions ordinarily are cumulative, not exclusive, Chicago Danville & Vincennes R. Co. v. Fosdick, 106 U.S. 47, 68, 1 S.Ct. 10, 27 L.Ed. 47, and when in terms exclusive, are strictly construed. Guaranty Trust and Safe Deposit Company v. Green Cove Springs & Melrose Railroad Co., 139 U.S. 137, 141-142, 11 S.Ct. 512, 35 L.Ed. 116. If plaintiff had committed a material breach of his contract, Foster-Porter could have terminated the contract without regard to the provisions of section 10. Under section 10 the contract could be terminated for a breach of obligation which did not amount to a material breach. [at 333]
If there were a New Jersey case on this subject, I would, or course, be obligated to follow it. As it is, I have a measure of freedom, with deference to the authority arrayed on each side. First reference, of course, must be made to the terms of the contract itself. Corn Exchange, etc., Phila. v. Taubel, *312 113 N.J.L. 605 (E. & A. 1934). As to whether the provision is the exclusive method of termination or not, the contract is neutral; it says nothing at all on the subject. Felsen argues that since the contract was prepared by Young Travelers, it must be construed against it in the event of ambiguity. As to the general soundness of this proposition, there can be no doubt. But what Felsen seeks here is not a simple construction of language, but the insertion into the contract of a provision which just does not appear there. It seems to me that the appropriate language is that of Judge Foley in Tomaiuoli v. United States Fidelity and Guaranty Co., 75 N.J. Super. 192 (App. Div. 1962), where he said:
Liberality in the construction of an agreement against the drafter when ambiguity appears, or when strict construction would contravene public policy, is a salutory principle. But it should not be used as excuse to read into a private agreement that which is not there, and that which people dealing fairly with one another could not have intended. So employed, it debases the law [at 207]
In the words of Justice Heher in Casriel v. King, 2 N.J. 45 (1945):
The polestar of construction is the intention of the parties to the contract as disclosed by the language used, taken as an entirety; and in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are to be regarded. [at 50]
Continuing, he said:
In short, we are to consider what was written in the light of the circumstances under which it was written, and give to the language a rational meaning consistent with express general purpose [at 51]
The construction for which Felsen contends is that, regardless of the extent of his breach, Young Travelers may not terminate unless it complies with the formality of a five-day written notice of termination. Indeed, his position is that because Young Travelers did not give such notice, it in turn committed a breach of contract and that he is entitled to damages. In my view, acceptance of such a position and the *313 majority view would constitute a mechanical adherence to a rule of law without consideration of basic underlying rules of contract construction. Ace Stone, Inc., v. Wayne Tp., 47 N.J. 431 (1966), is a case which makes it clear that such an approach is not the correct one. The contract in that case, for the construction of a sewer line project, contained a "no-damage" clause. Nevertheless, plaintiff sued the municipality, alleging that it had committed a breach of contract by not acquiring all the necessary rights of way. Summary judgment in favor of defendant was reversed. The court said:
It appears to us that the just course now is to remand the proceeding to the Law Division to enable the parties to introduce such oral and documentary evidence as may be available and relevant in aid of interpretation. After all of the evidence is in, determination may fairly be made as to whether the language used in the contract by the parties, when considered in the full light of their relations and objectives, and the attendant circumstances, contemplated that the extension of time clause and the related clauses would preclude the plaintiff from asserting a claim for damages under the particular circumstances presented. [at 440]
It thus became a question of fact as to whether the contract contemplated that damages would be barred in the specific situation involved. In Lyon v. Pollard, supra, plaintiff was hired by defendant to manage his hotel. The contract of employment provided that either party could terminate on 30 days' notice. Plaintiff brought an action for damages, alleging that her employment had been terminated without the requisite notice. The trial court refused to allow evidence that plaintiff was using opiates and was unfit to perform the contract. On appeal, the court stated:
If she rendered herself, or otherwise became, incapable of performing these duties, that of itself authorized defendant to rescind or terminate the contract * * *. The contract on her part implied some capability of performing the duties she had assumed, of rendering some service. If she could render none defendant was not bound to continue it even for the thirty days which the termination of it by notice required. [87 U.S. (20 Wall.) at 406]
*314 Here, too, it was a fact question as to whether a contract provision for termination by notice prevented a party from terminating for material breach. Similarly, there is here a fact question as to whether the notice provision prevented a party from terminating under circumstances such as this.
Mandelbaum's letter of April 29, 1970 was as close to an anticipatory repudiation of the contract as possible, without crossing the line. See Restatement, Contracts (1932), § 318 at 475. Felsen's conduct thereafter constituted a material breach. For practical purposes he did nothing from May 1 to June 1 to further the purposes of the contract, and after June 1 he did almost nothing. To make matters worse, he failed to deliver to Young Travelers even those contracts which he had obtained, thereby preventing Young Travelers from making appropriate preparation for the forthcoming camping season. The breach was not merely material, it was irreparable; the campers which had not been obtained by the beginning of July could not be supplied thereafter.
Taking into account the general tenor of the contract, the surrounding circumstances and the object which the contract was intended to serve, it is apparent that the notice provision was for the benefit of both parties. It benefited Young Travelers by giving it the power to terminate for matters which may not have been material breaches, although in the main the specific events of default recited in paragraph XXIII would constitute material breaches. From Felsen's point of view, the major value of the provision was that it gave him a right to cure a default. Clearly, however, it was not intended to be the exclusive remedy as to matters which could not be rectified. It can hardly be said that if Felsen had, in fact, completely repudiated, instead of coming close to the line, as he did at the end of April, that Young Travelers could have been expected to continue with the contract and obtain its remedy only in damages, unless it went through the formality of serving a five-day notice. Felsen's conduct beginning May 1, so far as its detrimental effects on the purposes *315 of the contract was concerned, was the equivalent of a repudiation. What he had failed to do could no longer be supplied. It was this conduct which entitled Young Travelers to terminate the contract, not its communication of May 6, nor its communication of July 14. That Young Travelers, under the erroneous impression that it had somehow to preserve the fiction of a five-day notice, took the position that the contract had terminated five days after its letter of May 6, does not prevent the fact that a material and irremediable breach had occurred after May 1 which made it utterly impossible for Young Travelers to perform the contract, from controlling the situation.
The motion for a new trial will be denied.
NOTES
[1] Since December 21, 1971, cancellation of a franchise agreement would be governed in some cases by N.J.S.A. 56:10-1 et seq. This is not one of the cases to which the statute would apply since gross sales did not exceed $36,000 for the 12 months next preceding the institution of suit as required by section 4 of the statute.