

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| SANDY R. DUNCAN, | § | No. 08-14-00025-CV |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 298th District Court |
| | § | |
| WOODLAWN MANUFACTURING, LTD. | | of Dallas County, Texas |
| | § | |
| | | (TC # DC-11-01216-M) |
| Appellee. | § | |

## **O P I N I O N**

Sandy Duncan sued Woodlawn Manufacturing, Ltd. for breach of an employment contract. The jury found that both Duncan and Woodlawn breached the parties' agreement, but Duncan did so first. It also failed to find any damages resulted from Woodlawn's breach. Following entry of a take nothing judgment, Duncan appeals. For the reasons stated below, we affirm.

## **FACTUAL SUMMARY**

Woodlawn makes custom machine parts for the defense industry at an East Texas facility.[1] The plant employed upwards of 150 persons at its peak and has been in operation for

---

[1] This appeal was transferred to this Court from the Dallas Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. *See* TEX.GOV'T CODE ANN. § 73.001 (West 2013). We follow the precedents of the Dallas Court to the extent they might conflict with our own. *See* TEX.R.APP.P. 41.3.

some forty years.  In 2008, the plant was purchased by Lone Star CRA Fund, LP, which owns a portfolio of different companies.

After the purchase, several Woodlawn senior managers entered into employment contracts with the company.  Sandy Duncan was one of them.  Duncan had initially been hired as an engineer in 2006, but in December 2009 he was promoted to President and CEO of Woodlawn.  He is a degreed engineer with a master's degree in business administration.

Under his employment agreement, Duncan agreed to faithfully perform his duties and responsibilities to the best of his ability.  He was to devote his full professional working time, attention, and energies to Woodlawn's business and act in its best interests.  He also agreed to comply with all policies, standards, and regulations of Woodlawn.  At trial, the parties disputed whether those standards and regulations included the provisions found in a company employee handbook.  The handbook included a section entitled "Serious Types of Poor Personal Conduct, Some Actions That May Result in Immediate Discharge" that listed a series of offenses which could result in anything from warnings to immediate termination, depending on the nature, frequency, or severity of the infraction.  One of the prohibited offenses was "[i]mmoral or indecent conduct (including suggestive or sexual remarks, propositions, or harassment), and repeated unwelcome comments of a personal nature."  Another section prohibited "cursing, obscene remarks, or intimidating language, racial or ethnic slurs, comments or jokes."  One section addressing drug and alcohol issues prohibited "Off-duty use, sale, or illegal involvement with drugs or alcohol in any manner which could cause adverse impact on community good-will toward the company . . . ."  The employee handbook generally counseled that no "drastic action" would be taken until the employee had been given an opportunity to correct the problem, "except in those cases where immediate discharge is called for by the very nature of the offense."

The employment agreement addressed how Duncan might leave Woodlawn's employment and what compensation would be due him if he did. The termination provisions contemplated four ways in which Duncan might leave: death or disability; termination for cause; termination without cause; and resignation. Only the termination for cause and termination without cause provisions are relevant and we set those out in full:

3. Termination. The Employment Period shall terminate on the earliest to occur of the following:

.    .    .

(b) Cause. Employer may terminate the Employment Period for Cause at any time. For the purposes of this Agreement, 'Cause' shall be defined as the following:

(i) Employee's breach of this Agreement, if such breach has not been cured by the Employee within 30 days of his receipt of written notice from the Employer specifying such breach;

(ii) Employee's gross negligence, fraud, or material dishonesty in the performance of the duties assigned to him by Employer pursuant to Section 1(b) hereof, in each such case as determined by the Board of Managers of the Employer's general partner in good faith;

(iii) Employee's violation of the covenant not to compete set forth in Section 6 hereof or unauthorized use of Employer's trade secrets or confidential information, if such violation has not been cured by the Employee within 30 days of his receipt of written notice from the Employer specifying such violation;

(iv) Employee's failure to diligently and effectively perform the duties assigned to him by Employer pursuant to Section 1(b) hereof, if such failure has not been cured by the Employee within 30 days of his receipt of written notice from the Employer specifying such failure;

(v) the indictment of Employee for a felony;

(vi) Employee's declaration of personal bankruptcy; and

(vii) any action taken by Employee which in the reasonable opinion of Employer materially adversely affects the business, goodwill, or reputation of Employer, its employees, or its customers, if such action has

3

not been cured by the Employee within 30 days of his receipt of written notice from the Employer specifying such action.

(c) <u>Without Cause</u>. Employer may terminate the Employment Period for any reason not specifically provided for in this Section 3, or for no reason, upon thirty (30) days' prior written notice to Employee.

Another section dictated what compensation would be due Duncan following termination. Termination for cause limited any severance compensation to his salary through the date of termination, while a "without cause" termination entitled him to other benefits:

4. <u>Effect of Termination</u>.

.    .    .

(b) <u>Termination pursuant to Section 3(b)</u>. If the Employment Period is terminated pursuant to Section 3(b) hereof, no further compensation shall be paid to Employee after the date of termination (other than base salary and benefits earned through Employee's last day of employment).

(c) <u>Termination Pursuant to Section 3(c)</u>. . . . If the Employment Period is terminated pursuant to Section 3(c) hereof after May 27, 2009, Employer shall, as liquidated damages or severance pay, or both, continue to pay the base salary and benefits provided in <u>Attachment 1</u> for six months. Employee shall also be entitled to a bonus, payable following the end of the fiscal year in which such termination occurred, equal to the amount Employee would have been entitled to receive pursuant to the calculation set forth in <u>Attachment 1</u>.

Woodlawn terminated Duncan for cause on October 8, 2010. The reasons developed at trial are sordid at best, but require recounting. First, Woodlawn contended that Duncan had several sexual liaisons with subordinate employees which reflected adversely on the workplace, and exposed the company to potential sexual harassment liability.

E.P.[2] started as an employee on the production floor. Duncan's mother, who was an administrative assistant, made the decision to bring her into the office to work as a receptionist. Duncan began seeing E.P. in the early summer of 2009 and had sexual relations with her. She

---

[2] We choose to identify several of the persons involved in this case by their initials only.

4

was nineteen at the time. He admitted to having sex with her on four occasions, including while he was President and CEO. After their third liaison, E.P. was promoted from receptionist to become Duncan's administrative assistant. At trial, Duncan testified he was comfortable with sexual relations with his administrative assistant and contended it affected neither his, nor her, job performance. He even suggested to his wife that the three of them engage in a "threesome." Word of his relationship with E.P. spread to several individuals at the plant. The relationship was stormy at times, and Duncan admitted to having at least one long conversation with her in his office, with E.P. in tears. Some of his efforts to console her were also documented on company emails, sent during working hours.[3]

Duncan also had a relationship with another employee, B.M., who started as an hourly employee, left the company, and was later rehired by Duncan. After re-hiring her, Duncan shared with B.M. that he had a sexual relationship with E.P. B.M. came up to him on the factory floor and slipped her phone number into his pocket. That started a flirting episode lasting over a year which finally lead to one sexual encounter in March 2010. B.M. was 28 at the time, and Duncan admitted that he was old enough to have been her father.

B.M. later left the company and filed for unemployment. The affair came to light at Woodlawn when B.M. called Duncan to complain that the State was seeking reimbursement for some of the unemployment benefits paid her. She threatened to "make trouble" for Duncan, which he interpreted as filing a sexual harassment charge, unless he paid the chargeback. Duncan did in fact pay her from funds he borrowed from his family. He documented in an email that: "Rather than having to defend myself to Lone Star Investments, I decided it would be easier on me to pay this amount to her." Duncan denied giving B.M. any preferential treatment

---

[3] E.P. wrote in an email: "Sorry Sandy. I just don't feel too good. I have so much on my mind. I feel like crying and letting it all out, but I can't even cry anymore." The company had a policy against use of company emails for personal use, but apparently that policy was widely violated.

at work, but he did personally gift her with items worth $12,000 during their relationship. Several people at Woodlawn were aware of this relationship.

A third sexual encounter occurred with an African American employee named A.W. As Duncan described it, he was driving home from the plant, when A.W. drove by him, flagged him down, and invited him to her apartment. She was a laborer working on the shop floor. The next day, Duncan sent an email on the Woodlawn server to two friends, one of whom was a former Woodlawn employee:

> I am definitely going to Hades. Just made out with [A.]. 24 yr old. Gorgeous new employee. Smoking hot BLACK girl. Over the last month, I've had 6 guys in the shop thanking me for hiring the new eye candy. I've taken a shine to her.... Ha! Get it? I said, 'shine'.

When one of the friends responded saying: "Black? Have you no dignity?" Duncan replied, "Yes, but this one's a very attractive Hi-yellow."[4] Duncan conceded this email was "outrageous" and contained "a racist tone" especially in light of the plant having an 80 percent minority and female workforce.

Along the same vein, Duncan admitted to hiring a prostitute when he was CEO and on a company business trip. He also entertained company clients at a strip club; on one occasion spending over $3,000 in single evening.

Next Woodlawn contended that Duncan had a problem with alcohol. Co-workers noticed that Duncan began drinking more than normal by the spring or summer of 2010. He was drinking on week nights. The jury heard evidence that he never drank at work, or came to work smelling of alcohol. But he along with some of the management team would have a drink over

---

[4] "High Yellow" is apparently a slang term, often derogatory, for an African American with lighter skin tones. *Graves v. District of Columbia*, 777 F. Supp.2d 109, 113 n.3 (D.D.C. 2011).

lunch. Duncan also drank at company functions if alcohol was being supplied. He was arrested for public intoxication in the early spring of 2010.

A company email in June 2010 documented that on one workday afternoon Duncan was at home and intoxicated. The email from Duncan's wife was sent to Duncan's mother who worked in the office at Woodlawn. Duncan's mother agreed to cover for him, telling others he had an emergency and would be gone the rest of the week. She was specifically concerned about keeping the truth from the company CFO, Suzon Holmes, who had been hired at the direction of Lone Star. Duncan's wife was so concerned that she thought he should be admitted to a rehab facility. By his own admission, Duncan would imbibe one to two drinks five times a week, sometimes two to three drinks, and occasionally "much more." He had told others that there were times he drank so much at lunch that he could not go back to work. There were also times he blacked-out from drinking. His wife and doctor both told him they were concerned about his drinking. Three months after his termination, he came to realize that he was an alcoholic. Prior to that, he was "in denial."

These issues all came to a head following a dinner on September 30, 2010. Duncan had invited the new plant manager, Cory Mayo, along with E.P. and Olivia Salsedo to discuss E.P. and Salsedo's new job functions. By his own admission, Duncan became intoxicated. He shared with the new plant manager, who had been at the plant less than a week, the fact of his past liaisons with B.M., E.P., and an unnamed third woman. He had plans to meet E.P. at a hotel later that night, but she became upset over his drinking and his wanting to publicly kiss her in the restaurant. Cory Mayo saw the two texting back and forth, which led to both women leaving the dinner, obviously upset. Duncan admitted to being loud and behaving offensively at the dinner, which was billed to the company credit card.

7

The next day Mayo saw that E.P. was still upset and learned she was considering resigning from the company. He relayed the events of the evening to the company CFO, Suzon Holmes, who was already aware of rumors of Duncan's affairs with employees. She in turn contacted John McGuire of Lone Star who had Mayo recount the details of the dinner to him. McGuire was the managing director of operations for Lone Star responsible for Woodlawn.

McGuire already had an inkling of the situation. In the spring 2010, he had been sent anonymously a newspaper clipping about Duncan's arrest for public intoxication. That led to Arthur Hollingsworth, Lone Star's managing partner, contacting Duncan to express Lone Star's disappointment with learning of the issue third hand. McGuire had also become aware of suit papers filed in August 2010 by another former employee, C.A., who sued the company claiming sexual harassment. While her claim did not directly involve Duncan, the suit papers apparently raised the issue that B.M. had received preferential treatment because of her relationship with Duncan.[5]

After learning of the September 30th dinner, McGuire relayed what he had learned to Hollingsworth, and the decision was made to immediately terminate Duncan. On October 8, 2010, McGuire personally came to the plant and informed Duncan that he was being terminated immediately because Duncan's actions were not furthering the best interests of the company, he had breached the trust between himself and the owners, and placed the company at risk for potential sexual harassment claims.[6]

Duncan's retort at trial, and throughout this appeal, is that each of the allegations noted above, even if true, are not valid contractual reasons for his termination because he was never

---

[5] When lawyers hired to defend Woodlawn in the C.A. case were interviewing Duncan about the allegations and rumors of a relationship with B.M., Duncan denied that the relationship was anything more than a friendship.

[6] Duncan recalled only that the sexual harassment issues were raised by McGuire when he was terminated.

given written notice and an opportunity to cure as contemplated by Section 3 (b) (i), (iii) or (iv) of his employment agreement. And while Section 3(b)(ii) allows for termination for gross negligence, fraud, or dishonesty without prior written notice, that provision requires that the Board of Managers make a determination to that effect which was never done.[7] Duncan emphasizes the notice and cure provisions were terms specifically negotiated by the parties; the original form employment contract did not have notice and cure language in Section 3 (b) (i), (iii) or (iv). Nor did the original form contract require the Board of Managers to meet and decide gross negligence, fraud or dishonesty issues. These terms were all added during the negotiation process.

Duncan also diminishes his conduct arguing that it occurred away from the workplace, it was not precluded by his contract or company policy (i.e. no morals clause or fraternization policy), and it did not impair his work performance. He points to the plant's increased sales and decreased costs during his tenure as CEO. Sales rose from about 17 million to 22 million dollars while he was at the company. He improved the physical plant, and redesigned the production line to improve efficiency. Duncan worked long hours, sometimes six and seven days a week. His mother attributed some of Duncan's personal failings to the stress of his long hours and job responsibilities.

## THE JURY CHARGE, DISPOSITION BELOW AND ISSUES ON APPEAL

The case was submitted to the jury on four liability questions. In question one, the jury found that Woodlawn failed to comply with the employment agreement it had with Duncan. In question two, the jury found that Duncan failed to comply with that same agreement. In question three, the jury found that Duncan's breach occurred first. Finally, in question four, the jury

---

[7] The Board of Managers consisted of Arthur Hollingsworth, Suzon Holmes, and Duncan.

9

found that Woodlawn's failure to comply was excused by Duncan's breach. In answering this question, the jury was instructed that Woodlawn would be excused by Duncan's "previous failure to comply with a material obligation" of the agreement.

The jury also failed to find any damages for Duncan in subsequent damage questions; it answered "0" for past salary for six months, bonus, car allowance, and damages for failure to give 30-days' notice. The jury also found zero as the amount of Duncan's attorneys fees. Based on these findings, the trial court entered a take nothing judgment in favor of Woodlawn.

Duncan raises five issues for review. In Issue One, he challenges the sufficiency of the evidence to support a finding that he committed any material breach of the contract. In Issue Two, he complains of the trial court entering judgment based on those findings. The gist of these arguments is that because Duncan was never given written notice with an opportunity to cure, nor did the Board of Managers meet and decree his conduct grossly negligent, fraudulent, or dishonest, Woodlawn failed to prove a material breach under the contract. In Issue Three, he contends the trial court erred in not defining the term "material" breach in the charge. Finally, in Issues Four and Five, he challenges the zero findings on damages and attorney's fees.

## SUFFICIENCY OF THE EVIDENCE FOR LIABILITY FINDINGS

In deciding Duncan's legal sufficiency claims, we are mindful that an appellate court will sustain a legal sufficiency or "no-evidence" challenge only if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Kohannim v. Katoli*, 440 S.W.3d 798, 811 (Tex.App.--El Paso 2013, pet. denied). In conducting our review, we consider the

10

evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822; *Kohannim*, 440 S.W.3d at 811. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id*. at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to make the finding under review. *Id*. at 827.

When the appellant challenges the factual sufficiency of an adverse finding on which the other party had the burden of proof, the appellant must demonstrate that there is insufficient evidence to support the adverse finding. *Rhey v. Redic*, 408 S.W.3d 440, 449 (Tex.App.--El Paso 2013, no pet.); *Escalante v. State Office of Risk Management*, 355 S.W.3d 341, 345 (Tex.App.--El Paso 2011, no pet.). We will consider, weigh, and examine all of the evidence in the record, both in support of, and contrary to, the finding. *Rhey*, 408 S.W.3d at 449; *Escalante*, 355 S.W.3d at 345. The trial court's findings will be set aside only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Rhey*, 408 S.W.3d at 449; *see City of Keller*, 168 S.W.3d at 822. When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the challenged finding if a reasonable person could do so. *See City of Keller*, 168 S.W.3d. at 821.

11

"A party breaches a contract when he fails to perform an act that he has expressly or impliedly promised to perform." *STR Constructors, Ltd. v. Newman Tile, Inc.*, 395 S.W.3d 383, 387 (Tex.App.--El Paso 2013, no pet.), *quoting*, *Examination Mgmt. Svcs., Inc. v. Kersh Risk Mgmt., Inc.,* 367 S.W.3d 835, 844 (Tex.App.--Dallas 2012, no pet.). When one party commits a material breach, the other party is discharged or excused from further performance. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.,* 134 S.W.3d 195, 198 (Tex. 2004); *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform."). The question in these cases is often who breached the contract first. *Mustang*, 134 S.W.3d at 200.

Here, the jury was asked that question and concluded that Duncan breached first. The jury also found his breach was material and excused Woodlawn's performance. The issue, then, is whether there is some evidence, or factually sufficient evidence, of a material breach by Duncan as found by the jury in questions two and four. Duncan relies on a line of cases that requires strict adherence to what we refer to as "notice and cure" clauses. Absent proper notice of a claimed breach, and an opportunity to cure, Duncan contends the other party cannot terminate the contract.

Duncan primarily relies on *Cheung-Loon, LLC v. Cergaon, Inc.*, 392 S.W.3d 738 (Tex.App.--Dallas 2012, no pet.). That case involved a tenant who claimed the lessor of a parking lot had breached the parties' lease. *Id*. at 740. The lessee ran a restaurant and leased an adjacent parking lot for its patrons. *Id*. It became upset when the lot was being used to its exclusion by other tenants of the same lessor. *Id*. The lease required that both parties must provide notice in writing and an opportunity to cure any potential breach. *Id.* at 741. The lessee

12

had provided oral notice to the lessor of the parking issue to no avail, but not written notice. Believing the lessor to be in default under the terms of the lease, the lessee stopped paying rent, leading to the lawsuit. *Id.* at 742. The lessee prevailed in the trial court, obtaining a summary judgment in its favor. *Id.* at 743. The trial court rejected the lessor's position that because the lessee never provided written notice of a failure to perform, along with the thirty day opportunity to cure, it could not claim a right to rescission. *Id.* The appellate court reversed, noting that the lessee bore the burden of showing that all conditions precedent to its recovery under the contract were met. *Id.* at 744-45. The court of appeals held that "[a]bsent a repudiation by [the lessor], [the lessee] was required to provide it . . . with notice of the alleged default and an opportunity to cure." *Id.* at 745.

Notice and cure clauses are found in a number of different contracts, and are generally enforceable as valid contract terms. *E.g*., *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982)(maker of note must comply with acceleration clause requiring notice and cure period); *Neurobehavorial Associates, P.A. v. Cypress Creek Hosp., Inc*., 995 S.W.2d 326, 332 (Tex.App.--Houston [1st. Dist.] 1999, no pet.)(reversing a summary judgment arising out of the cancellation of a services contract to the hospital when the hospital failed to give thirty day notice with an opportunity to cure).

Woodlawn counters that some breaches of contract which fundamentally undermine the essential purpose of an agreement justify immediate termination, even in the face of notice and cure provisions. It contends this is such a case because the trust between it and a high level manager was irreparably impaired. Accordingly, Duncan's breach operated to unwind the entire agreement, including the notice and cure periods found in the termination clause.

One of the earlier cases in this genre is *Olin Corp. v. Central Industries, Inc.*, 576 F.2d 642 (5th Cir. 1978), applying Mississippi law. Olin manufactured fertilizer and contracted with Central to store and bag Olin's fertilizer. *Id.* at 644. The evidence suggested that Central was under filling the bags, and then selling the shorted amounts on the side. *Id*. at 645. When Olin discovered this, it terminated the contract immediately, despite a notice and cure provision. *Id*. at 647. The Fifth Circuit found two opposing views on the enforceability of notice and cure provisions. The "Corbin" view would hold that the contract language is the exclusive method for terminating the contract, while the "Williston" view would allow termination for a breach that goes to the "root of the matter or essence of the contract." *Id.* at 647, *citing* 6 *Corbin, Contracts* § 1266 at 64 (1962) and *Williston on Contracts*, Third Edition, § 842, 165 n.1. The Fifth Circuit concluded that the Williston view was likely the governing law in Mississippi, and held the nature of the breach permitted Olin to rescind the contract immediately, despite the notice and cure provision. *Id*. at 648. It referred to the breach as "vital" to the existence of the contract, a label picked up by some later courts applying the principle. *Id*. at 647.[8]

Along a similar line is *Larken, Inc. v. Larken Iowa City Ltd. Partnership*, 589 N.W.2d 700 (Iowa 1998). There, the owner of a hotel sought to cancel its management contract with Larken when it discovered that Larken had engaged in self-dealing (awarding a telephone contract to another company that Larken effectively owned). *Id*. at 702. Larken defended, claiming that the owner failed to provide notice and a chance to cure as required by the parties' contract. *Id*. at 703. Larken also claimed that the hotel was profitable which was the primary

---

[8] Notably, later authors updating the *Corbin* work agreed that *Olin* was correctly decided because the breaches at issue were not the kind that could be cured. 6 Lawrence A. Cunningham & Arthur J. Jacobson, *Corbin on Contracts* § 1266 at 27 (Supp. 2001)("The notice provision assumed that the breaches which would be used to terminate the contract would be curable breaches. There was a frustration of purpose when a breach involving fundamental dishonesty by party occurred, because no amount of payment for past thefts . . . could ever restore the business trust and confidence . . . ."); 13 Sarah Howard Jenkins, *Corbin on Contracts* § 68.9, 248 (2003).

14

objective of the management contract. *Id*. at 701. The court disagreed with Larken, finding the self-dealing so serious that it frustrated an essential purpose of the agreement, namely to "manage the hotel in the best interests of the owner and to be honest and forthright in its dealings." *Id*. at 704.

The holdings in *Olin* and *Larken* have been adopted by a number of other jurisdictions. *L.K. Comstock & Co, Inc. v. United Engineers & Constructors Inc.*, 880 F.2d 219, 231-32 (9th Cir. 1989)(applying Arizona law and holding that a party need not provide the contract's forty-eight hour notice before canceling when the defaulting party committed a "vital" breach that could not be cured in that amount of time); *Leghorn v. Wieland*, 289 So.2d 745, 748 (Fla.Ct.App. 1974)(employee charged with misappropriating corporate funds for his own use could not rely on notice and cure provision given impossibility of curing disloyalty and dishonesty claims); *Young Travelers Day Camps, Inc. v. Felson*, 118 N.J.Super. 304, 287 A.2d 231, 237 (1972) (camp director unable to remedy breach for failing to secure campers could not rely on notice/cure clause in contract); *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 567, 962 A.2d 639, 651 (2009)(allowing cancellation of franchise agreement without notice and chance to cure when franchisee was shipping on the side to avoid paying percentages to franchisor; breach went to the heart of trust and loyalty issues); *but see Ashker v. Aurora Medical Group, Inc*., 352 Wis.2d 193, 841 N.W.2d 297 (2013)(radiologist discharged for destroying medical records to cover up malpractice claim entitled to "termination without cause" severance pay because 30-day notice and cure provision was not complied with for a "cause" termination).

Whether these cases reflect Texas law is an issue we do not decide, because we conclude that even if Texas recognizes a "vital" breach as some distinct common law defense, it would not apply here. When parties have spoken comprehensively on an issue in their contract, we are not

at liberty to add contractual terms they never intended. Many of the "vital" breach cases analyze whether the notice and cure provision was intended by the parties as the exclusive remedy, or whether it was only a cumulative remedy. *Felson*, 118 N.J.Super. at 309, 287 A.2d at 234; *Wieland*, 289 So.2d at 747; *LJL Transp,* 599 Pa. at 558, 962 A.2d at 647. When the parties speak comprehensively on a subject, they likely intend to exclude outside gap fillers. *See Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 24-25 (Tex. 2004) (arbitration agreement which comprehensively addressed selection of arbitrators excluded AAA selection criteria and rules which were only intended as gap fillers).

Duncan's employment contract exhaustively details the various ways that Duncan could leave employment--death, disability, resignation, termination for cause and termination without cause. The provision addressing termination for cause lists seven different categories of cause, each with particular provisions addressing whether notice and cure might apply. The employee manual lists multiple other reasons for termination and describes the step discharge system to enforce those rules. If we judicially add another category, whether called vital breach or something else, we would frustrate the intent of the parties as expressed in their agreement, something we are prohibited from doing. *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex. 2000)(primary goal in contract interpretation is to give effect to the intentions of the parties as expressed in the contract); *Ideal Lease Serv., Inc. v. Amoco Production Co., Inc.,* 662 S.W.2d 951, 953 (Tex. 1983)(a court should not expand the parties' rights or responsibilities beyond the limits agreed upon by them in the contract). Moreover, injecting the idea of a "vital breach" into a contract that already comprehensively addresses reasons for termination would

16

only add uncertainty to the parties' dealings. What is egregious enough to constitute a vital breach for one jury or court, might vary with another.[9]

But having rejected the "vital" breach line of cases in this particular situation does not end our inquiry. We still must determine whether there is some evidence on this record to sustain the jury's belief that Duncan materially breached the contract first. First, we find sufficient evidence to support the view that the notice and cure periods would have been futile, and the law does not require the performance of a futile act. Second, the parties placed more than just the employment contract before the jury. They also admitted evidence of the company rules and policies as found in the employee handbook, which appears to be incorporated by Duncan's employment agreement, and which also addressed termination. Reading those requirements as part of the contract would have given the jury a basis, apart from the employment contract, to find a material breach for which no notice and cure period was required.

Texas law does not require the performance of a futile act. *DiGiuseppe v. Lawler,* 269 S.W.3d 588, 594-95 (Tex. 2008)(collecting cases for principle that when seller refuses to close on property, buyer is general excused from useless act of tendering purchase price to obtain specific performance). In *Cergaon,* the case upon which Duncan primarily relies, the lessee in fact argued that "it was unnecessary . . . to provide notice of default because any such notice would have been futile." 392 S.W.3d at 745. On the summary judgment record before it, the court held the lessee "introduced no evidence . . . of any conduct by [the lessor] occurring before [the lessee] terminated the lease that would indicate the futility of a demand for performance." *Id.* at 745.

---

[9] Even the authors of *Corbin on Contracts* cannot describe the defining boundaries of what constitutes a "vital" breach. "Obviously not every vital breach will excuse the obligation to follow the contract procedures for termination . . . Courts, using their good sense, will be able to tell breaches which would excuse the obligation to give notice from breaches which do not." 6 Lawrence A. Cunningham & Arthur J. Jacobson, *Corbin on Contracts* § 1266 at 27 (Supp. 2001).

But Duncan's case comes to us for review of jury findings where there was evidence of both of the alleged breaches, and evidence of whether they could have been cured. With regard to Duncan's drinking issues, we note that Duncan had been counseled on his apparent excessive drinking without effect well before the termination. His wife and doctor had raised the issue with him. Even Lone Star called the issue to his attention when it learned of his conviction for public intoxication. By his own admission, Duncan did not recognize that he had a problem with alcohol until three months after his termination when he finally came to the conclusion that he was an alcoholic. A jury might well have believed that a letter from Lone Star would not have resulted in some earlier recognition and solution.

As to his relationships with subordinate employees, there was direct evidence that Lone Star did not believe the issue could be cured.[10] Perhaps Duncan could have ended his relationships with the employees following a written demand to do so, but how could he cure the effect of the rumors that were already running rampant through the plant? How could he undo the perception of favoritism garnered by those who had sexual relations with him? Woodlawn's owners believed that Duncan's efforts to hide these issues "completely" broke their trust with him.

Viewing the evidence in the light most favorable to the findings, as we must, there is legally and factually sufficient evidence which the jury could have believed that the notice and cure provision would have been futile. Futility of curing the defect can defeat strict enforcement of a notice and cure clause. *Giuffre Hyundai, Ltd. v. Hyundai Motor America*, 756 F.3d 204 (2d

---

[10] Q. (By Mr. Brown) Well, the plaintiff's counsel asked you about the cure provision and why you didn't give notice. That's what I want to ask you about. Is there something that you think Mr. Duncan could have done within 30 days if you had given him notice to cure his misconduct?
A. No.
Q. Is there something that he could have done to cure his lack of integrity?
A. No.
Q. Is there something he could have done to cure his breach of trust?
A. No.

18

Cir. 2014)(applying New York law, Hyundai excused from notice and cure provision when judgment against dealership for pattern of deceptive acts placed dealership in violation of dealership agreement and could not be cured); *Felson*, 118 N.J.Super. at 314, 287 A.2d at 237 (camp director unable to remedy breach for failing to secure campers and could not rely on notice/cure clause in contract); *AAMCO Industries, Inc. v. DeWolf*, 312 Minn. 95, 250 N.W.2d 835, 840 (1977)(fact finder's view that notice and cure period would be futile and fruitless obviated need to comply with same); *Leghorn v. Wieland*, 289 So.2d at 748 (employee charged with misappropriating corporate funds for his own use could not rely on notice and cure provision given impossibility of curing disloyalty and dishonesty claims).

The provisions of the employee handbook also provided the jury a path to find a material breach where no notice and cure provisions might apply. Duncan's employment contract required him to comply with all company policies and rules.[11] Several company policies are contained in the employment handbook, including prohibitions against "[i]mmoral or indecent conduct (including suggestive or sexual remarks, propositions, or harassment)" and "[o]ff-duty use, sale, or illegal involvement with drugs or alcohol in any manner which could cause adverse impact on community good-will toward the company . . . ." Violations of these provisions, depending on their frequency and severity, could warrant immediate termination. While it was disputed whether the provisions of the handbook applied to Duncan, both parties elicited evidence of whether it did or did not apply, apparently leaving the decision for the jury. Duncan offered evidence from his mother who was involved in the initial implementation of the employee handbook and who claimed it did not apply to management employees. The company's human resources manager, however, testified that the rules in the employee handbook

---

[11] "Employee shall comply with all policies, standards, and regulations of Employer now or hereafter promulgated as the same are in effect from time to time."

19

applied to everyone.  Neither party sought to have the trial court determine as a matter of contract interpretation whether Duncan's employment contract did or did not incorporate the employee handbook.  Having left that issue to the jury, there was sufficient testimony that the rules in the employee handbook applied to everyone, including Duncan.  In turn, the evidence would support a finding that Duncan violated either the morality provision, or off-duty drinking provision, which could have triggered an immediate termination.

In response, Duncan urges that cases holding that an employment manual, which disclaims being an employment contract, cannot alter the terms of an at will employment relationship.  *See e.g. Vida v. El Paso Employees' Fed. Credit Union,* 885 S.W.2d 177, 181 (Tex.App.--El Paso 1994, no writ).  We do not contest that principle, but think it misses the point.  Duncan's employment contract incorporated by direct reference company rules and policies and required him to comply with them.  When one document is incorporated into another by reference, the two documents must be construed together.  *In re Raymond James & Associates, Inc.*, 196 S.W.3d 311, 320 (Tex.App.--Houston [1st Dist.] 2006, no pet.); *Wolfe v. Speed Fab-Crete Corp. Int'l,* 507 S.W.2d 276, 278 (Tex.Civ.App.--Fort Worth 1974, no writ).  His conduct fell within at least two of the incorporated handbook rules, which by their terms permitted immediate termination based on the circumstances.  Nor do we find availing Duncan's contention that the employment agreement is the more specific document which must control.  The rules found in the employee handbook are just as specific as to prohibited conduct and just as specific as to the consequence and timing of disciplinary action.  We therefore overrule Issues One and Two.

## CHARGE ERROR

In Issue Three, Duncan contends the trial court erred in not including a definition of

materiality in the charge. The jury was asked: "Was Woodlawn Manufacturing, Ltd.'s failure to comply excused?" The jury was instructed in conjunction with that question: "Failure to comply by Woodlawn Manufacturing, Ltd is excused by Sandy Duncan's previous failure to comply with a *material* obligation of the same agreement." [Emphasis added].

Duncan's argument here is that the trial court should have included a definition of "material" that tracked language from the Texas Supreme Court's decision in *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195 (Tex. 2004). There, Mustang hired Driver to build a stretch of pipeline. During the contracting process, Mustang emphasized the importance of meeting the construction schedule. *Id.* at 196. Driver failed to meet the schedule causing Mustang to terminate the contract and hire another contractor to finish the job. *Id.* at 197. The jury found both parties breached the contract, but Driver convinced the trial court to enter judgment in its favor. *Id.* The court of appeals affirmed, reasoning that because the jury was never asked if Driver's breach was material, the finding against it would not justify Mustang's termination of the contract. *Id.* at 198.

The Texas Supreme Court reversed, holding that time was of the essence to the parties' contract and Driver's failure to meet schedule was a material breach as matter of law. *Id.* at 200. The court suggested the use of a disjunctive submission in this situation (Did party X or Y fail to comply with the parties' contract?) "accompanied by an appropriate instruction directing the jury to decide who committed the first material breach." *Id.* While *Mustang* does not require a definition of materiality be included in that disjunctive submission, the opinion quotes and applies from the Restatement (Second) of Contracts § 241 (1981) five circumstances to consider in determining the materiality of a breach. *Id.* at 199. Our question is whether the trial court erred in not submitting the Restatement materiality factors to the jury.

21

We review charge error for an abuse of discretion. *Financial Ins. Co. v. Ragsdale,* 166 S.W.3d 922, 926 (Tex.App.--El Paso 2005, no pet.). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex. 2003), *citing Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985). In reviewing the charge, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *DeLeon v. Furr's Supermarkets, Inc.,* 31 S.W.3d 297, 300 (Tex.App.--El Paso 2000, no pet.). Even if the trial court has abused its discretion, we reverse only when the error is shown to be harmful. *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 749-50 (Tex. 1980). "We may not reverse unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment." *Braudrick v. Wal-Mart Stores, Inc.,* 250 S.W.3d 471, 475 (Tex.App.--El Paso 2008, no pet.), *quoting DeLeon,* 31 S.W.3d at 300.

Woodlawn initially responds that Duncan did not properly preserve error. TEX.R.CIV.P. 274 provides that: "A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Whether a party adequately preserves charge error focuses on the trial court's awareness and opportunity to remedy the alleged problem. *Burbage v. Burbage*, 447 S.W.3d 249 (Tex. 2014); *Cruz v. Andrews Restoration, Inc.,* 364 S.W.3d 817, 829-30 (Tex. 2012); *State Dept. of Highways & Public Transportation v. Payne,* 838 S.W.2d 235, 241 (Tex. 1992)("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and

22

plainly, and obtained a ruling."). A party must have timely and plainly made the trial court aware of the problem and obtained a ruling. *Cruz*, 364 S.Wshould.3d at 829-30; *see also* TEX.R.APP.P. 33.1(a).

Prior to trial, Duncan submitted requested issues and instructions which included a question asking whether Duncan's failure to comply was "material." That question included an instruction reciting four of the five Restatement factors for determining materiality.[12] He omitted the "standards of good faith and fair dealing" element contained in the Restatement, which is also contained in the suggested definition of materiality from the Texas Pattern Jury Charges and recited in the *Mustang* opinion.[13] Comm. On Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges: Business PJC 101.2 (2014); *Mustang*, 134 S.W.3d at 199. Duncan's requested issues, while containing the usual signature line for the court to refuse, accept, or accept with changes, were not endorsed by the trial court. As noted in *Cruz*, trial courts cannot be expected to "comb through the parties' pretrial filings to ensure that the resulting document comports precisely with their requests--that is the parties' responsibility." 364 S.W.3d at 831. The proposed charge submitted by Duncan prior to trial would not preserve error because it is not apparent from the record the trial judge ever saw it, and in any event, it is not substantially correct in that it omitted the good faith element. TEX.R.CIV.P. 278 ("Failure to submit a

---

[12] His instruction reads:

> You are instructed that circumstances to consider in determining whether a failure to comply is material include:
> a. The extent to which the injured party will be deprived of the benefit which he reasonably expected;
> b. the extent to which the injured party can adequately be compensated for the part of that of which he will be deprived;
> c. The extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> d. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances indicating any reasonable assurances.

[13] That fifth element is defined in the Restatement: "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." Restatement (Second) of Contracts § 241 (1981).

definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment.").

The parties had an informal charge conference which is not of record. After the trial court prepared the final charge, Duncan's only objection was that:

> We believe that the charge is misleading, in that even though the materiality issue is relevant in this case and subsumed by Question 4, which is whether Woodlawn's failure is excused, the way the charge is written, it isn't clear that even if Sandy Duncan breached the contract, that doesn't excuse Woodlawn unless his breach is material.

The trial court overruled this objection, reasoning that all the breaches would be material, such that an instruction or question on materiality was unnecessary.

While it is unclear on this record whether the trial court was aware of Duncan's specific proposed definition of materiality, or why Duncan was requesting it, the trial judge did appear to be aware of some request to define the term. But even if error was preserved under a generous interpretation of the rules, we nonetheless conclude that the trial court did not err in failing to submit a definition of materiality, or that if was error, the error was harmless.

As in the *Mustang* case, we find that the particular breaches that Woodlawn relies on are material as a matter of law. Woodlawn discharged Duncan in part because he attempted to cover up some of his personal issues from the company, thereby breaching the trust between himself and the owners. Against the advice of the human resources manager, he paid money demanded by B.M., so that Woodlawn would not find out about the potential claim. It is beyond dispute that the trust and confidence a company has in a chief executive officer is material to the parties' relationship. A company can be vicariously liable for the acts of a vice-principal, such as the CEO. *Bennett v. Reynolds*, 315 S.W.3d 867, 884-85 (Tex. 2010). In Texas, corporate officers and directors owe a strict fiduciary obligation to their corporation. *See Int'l Bankers Life Ins.*

24

*Co. v. Holloway,* 368 S.W.2d 567, 576-77 (Tex. 1963); *Lifshutz v. Lifshutz,* 199 S.W.3d 9, 18-19 (Tex.App.--San Antonio, 2006, pet. denied). The fiduciary status of corporate officers and directors give rise to three broad duties: the duty of due care, loyalty, and obedience. *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 719 (5th Cir. 1984). Bound up in that is a duty of honesty. *Holloway,* 368 S.W.2d at 577 (discussing "the extreme measure of candor, unselfishness, and good faith," owed by corporate officers). Actions of a CEO which touch upon these fiduciary and trust obligations would undoubtedly be material.

Additionally, Duncan's conduct potentially exposed Woodlawn to sexual harassment liability which would be material to the company. The Texas Commission on Human Rights Act makes it unlawful for an employer to discriminate against an employee with respect to compensation or the terms, conditions, or privileges of employment because of race, color, disability, religion, sex, or national origin. TEX.LAB.CODE ANN. § 21.051 (West 2006). Federal law provides similar employee protections. *Soto v. El Paso Natural Gas,* 942 S.W.2d 671, 677 (Tex.App.--El Paso 1997, pet. denied). The law recognizes two types of sexual harassment claim: *quid pro quo* and hostile work environment. *Id.* at 677. To establish a *quid pro quo* claim, a plaintiff must prove: (1) a supervisor (2) because of sex (3) subjects an employee to (4) unwelcome conduct that (5) affects a tangible aspect of the employment relationship. *Wal-Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 470 (Tex.App.--Austin 2000, pet. denied).

Duncan's conduct with regard to E.P. at the dinner meeting on September 30 provides some evidence arguably meeting all these elements. E.P., a subordinate, was asked by her supervisor to kiss in a public restaurant, a request she found upsetting and unwelcome. The next day she considered resigning from the company and was in tears. Whether she brought a claim or not begs the question. Duncan's conduct potentially exposed Woodlawn to a claim. Exposing

25

a company to a potential sexual harassment claim would be material to most companies. The situation was compounded here in that at least one other former employee had threatened a claim, and another was using his conduct to support her sexual harassment claim. A jury instruction encompassing the Restatement criteria would not have aided the jury in deciding the materiality of this conduct.

Finally, Duncan's drinking issue would also be material in light of his admission that he informed others he was missing work, was an alcoholic, and others around him noticed the problem. The fact that Woodlawn specifically addressed off premises drinking as a violation of company rules also suggests its importance to the company. Duncan acknowledged these issues all came to together such that by the date of his termination, he was essentially out of control.[14] We conclude that the trial court did not abuse its discretion in concluding that these claimed breaches were material, or if it did, that it caused the rendition of an improper judgment. Accordingly, we overrule Issue Three.

## DAMAGES ISSUES

In Issues Four and Five, Duncan complains of the jury findings of zero damages and attorney's fees, contending there is no evidence to support the answers, or alternatively, they are against the great weight and preponderance of the evidence. In light of our determination on the liability issues, it is unnecessary to address the zero damage awards. TEX.R.APP.P. 47.1. Duncan concedes the same in his Reply Brief. We therefore overrule Issues Four and Five and affirm the judgment below.

---

[14] Q. After all this time, do you now admit that you were out of control during your presidency at Woodlawn?
  A. In hindsight, I do have major regret over some of the things that I have done, yes. Yes, to answer your question.

June 17, 2015

                        ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.